# Exhibit F

# HENGELER MUELLER

Hengeler Mueller • Postfach 17 04 18 • 60078 Frankfurt am Main

Dr. Markus Meier
Partner

Dr. Philipp Hanfland
Partner

Direktwahl
Direct Number
+49 69 17095-370

E-Mail der Absender
Senders' E-mail
markus.meier@hengeler.com
philipp.hanfland@hengeler.com

Bockenheimer Landstraße 24
60323 Frankfurt am Main
Telefon +49 69 17095-0
Telefax +49 69 17095-099
www.hengeler.com

An das
Oberlandesgericht Stuttgart
1. Zivilsenat
Olgastraße 2
70182 Stuttgart

Frankfurt am Main, 25. Februar 2019
90727572v1

**Berufungsbegründung**

In Sachen

1. Greenwich (Japan) Limited
2. Gateshead (Japan) LLC

                      RAe Broich, Frankfurt am Main

gegen

Porsche Automobil Holding SE       RAe Hengeler Mueller, Frankfurt am Main
                                                    RAe Dres. Markus Meier und Philipp Hanfland

## - 1 U 205/18 -

danken wir für die gewährte Fristverlängerung. Namens und in Vollmacht der Beklagten und Berufungsklägerin (nachfolgend "Beklagte") wird beantragt,

1. unter teilweiser Abänderung des Urteils des Landgerichts vom 24. Oktober 2018 – Az. 22 O 348/16 – die Klage insgesamt abzuweisen;

| | | |
|---|---|---|
| | Beweis: | Geschäftsbericht Rumpfgeschäftsjahr 2010 der Beklagten (Auszug), S. 5, 38 |

- Anlage B 127 -

928  Dem Geschäftsbericht für das Rumpfgeschäftsjahr 2010 folgte der Halbjahresfinanzbericht zum 30. Juni 2011. Dieser enthielt einen Konzern-Zwischenlagebericht.

| | Beweis: | Halbjahresfinanzbericht der Beklagten zum 30. Juni 2011 (Auszug), S. 1 ff. |
|---|---|---|

- Anlage B 128 -

929  Es folgten weitere Geschäfts- und Halbjahresfinanzberichte, die die vom Landgericht als nachträglich unrichtig beanstandeten Informationen im Geschäftsbericht 2009/2010 weiter haben in den Hintergrund treten lassen.

930  Im Mai 2014 waren die Angaben aus dem Konzernlagebericht 2009/2010 in jedem Fall längst überholt. Sie konnten nicht mehr Anknüpfungspunkt für eine Berichtigungspflicht sein und schon gar nicht mehr für eine kapitalmarktrechtliche Informationshaftung.

I. **Rechtsfehlerhafte Annahme einer schlüssigen Darlegung einer Aktivlegitimation der Klägerseite durch das Landgericht**

931  Das Landgericht hat ferner rechtsfehlerhaft eine vermeintliche Aktivlegitimation der Klägerseite angenommen (gegen Urteil, Rn. 274). Die Klägerseite hat ihre Anspruchsberechtigung zur Geltendmachung etwaiger Schadensersatzansprüche gemäß § 37b Abs. 1 Nr. 1 WpHG a.F. nicht schlüssig dargelegt.

932  a) Nach § 37b Abs. 1 Nr. 1 WpHG a.F. ist ein Dritter nur anspruchsberechtigt,

> "(…) wenn der Dritte *die* Finanzinstrumente nach der Unterlassung erwirbt und er bei Bekanntwerden der Insiderinformationen noch Inhaber *der* Finanzinstrumente ist (…)." (Hervorh. d.U.)

933 Der Wortlaut der Norm macht deutlich, dass ein Anleger durchgängig während des gesamten Zeitraums Inhaber *desselben* Finanzinstruments gewesen sein muss. Die gesetzliche Formulierung erfordert eine Inhaberschaft der konkreten, während der Desinformationsphase erworbenen Aktien am Ende der Desinformationsphase (vgl. dazu bereits Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 4 ff.). Eine noch deutlichere Formulierung, wie sie das Landgericht erwartet, wäre überflüssig (gegen Urteil, Rn. 279). Hätte der Gesetzgeber gewollt, dass ein Anspruchsteller lediglich Inhaber irgendwelcher Aktien eines Emittenten sein muss, hätte er dies mit einer abstrakteren Formulierung gekennzeichnet (beispielsweise "bei Bekanntwerden der Insiderinformation noch Inhaber *von* Finanzinstrumenten").

934 Ein Anspruch gemäß § 37b Abs. 1 Nr. 1 WpHG a.F. erfordert demnach, dass der Anspruchsteller im Zeitpunkt des Bekanntwerdens der angeblichen Insiderinformation noch Inhaber der nämlichen streitgegenständlichen Vorzugsaktien der Beklagten war.

> Vgl. KölnKommWpHG-Möllers/Leisch, 2. Aufl., §§ 37b, c Rn. 217; Baumbach/Hopt-Kumpan, HGB, Komm., 37. Aufl., § 37b WpHG Rn. 3; Just/Voß/Ritz/Becker-Bruchwitz, WpHG, Komm., 2015, §§ 37b, 37c Rn. 35; Fuchs-Fuchs, WpHG, Komm., 2. Aufl., § 37c Rn. 21.

935 Folglich muss die Klägerseite für jede einzelne angeblich von ihr erworbene, nämliche streitgegenständliche Vorzugsaktie der Beklagten darlegen und ggf. beweisen, dass sie diese nämliche Vorzugsaktie noch bei Bekanntwerden der angeblichen Insiderinformation hielt. Das hat die Klägerseite hinsichtlich der in der Zeit vom 3. Juni 2014 bis 6. Juli 2015 vermeintlich erworbenen Aktien nicht getan. Vorsorglich wird mit Nichtwissen bestritten, dass die Klägerseite bei Bekanntwerden der angeblichen Insiderinformation noch die nämlichen streitgegenständlichen Vorzugsaktien der Beklagten gehalten hat.

936 Sowohl die Klägerin zu 1 als auch die Klägerin zu 2 haben vielmehr unstreitig 27.858 bzw. 14.351 Vorzugsaktien der Beklagten während der vermeintlichen Desinformationsphase *veräußert*. Dabei ist nicht

ersichtlich, welche Aktien konkret und ob nicht gerade die vermeintlich anspruchsbegründenden Aktien veräußert wurden.

937    b)    Eine konkrete Zuordnung von Aktienkäufen und -verkäufen ist für die Prüfung eines Schadens im Rahmen der §§ 37b, c WpHG a.F. unerlässlich (dazu bereits Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 7 ff.) Verlangt der Anleger den Kursdifferenzschaden, muss er darlegen und beweisen, dass der Börsenkurs *zum jeweiligen Zeitpunkt des Erwerbs* der streitgegenständlichen Aktien überhöht war.

> BGH, NJW 2012, 1800 (IKB; juris, Rn. 67); KölnKommWpHG-Möllers/Leisch, 2. Aufl., §§ 37b, c Rn. 478.

938        Sowohl Bestehen als auch Höhe eines etwaigen Kursdifferenzschadens hängen im Hinblick auf jede Aktie maßgeblich davon ab, *wann* die Aktie erworben wurde. Das gilt besonders dann, wenn man, wie das Landgericht (Urteil, Rn. 288), rechtsfehlerhaft den Kursdifferenzschaden als Prozentsatz des jeweiligen (sich von Tag zu Tag ändernden) Börsenkurses bemessen wollte (dazu unten Rn. 991 ff). Bei dieser Berechnungsmethode ergäbe sich für jeden Tag ein anderer Kursdifferenzschaden.

939    c)    Eine Zuordnung von Aktienkäufen und -verkäufen ist der Klägerseite möglich. Die Klägerseite ist für eine entsprechende Zuordnung darlegungs- und beweispflichtig. Ihrer Beweislast ist die Klägerseite nicht nachgekommen.

940        Die Klägerseite hat in den von ihr vorgelegten Wertpapierabrechnungen (Anlage K 46) einige Verkäufe offengelegt. Die Abrechnungen lassen jedoch keine Rückschlüsse darauf zu, welche der zuvor erworbenen nämlichen Vorzugsaktien der Beklagten die Klägerseite jeweils veräußert haben will.

941        Damit ist die Klage unschlüssig. Jedenfalls aber hätten die unstreitig erfolgten Verkäufe während der vermeintlichen Desinformationsphase von den angeblich anspruchsbegründenden Vorzugsaktien in Abzug gebracht werden müssen.

942   d)   Das Landgericht hat zum Nachteil der Beklagten die "First-in-First-out-Methode" ("FiFo-Methode") angewendet und damit die unstreitig erfolgten Verkäufe während der vermeintlichen Desinformationsphase unberücksichtigt gelassen (Urteil, Rn. 277 ff.). Das Landgericht ist der Auffassung, die FiFo-Methode sei vom Gesetzgeber so "anerkannt", dass sie "allgemein auch bei der Schadensberechnung und der hier in Frage stehenden Aktivlegitimation herangezogen werden" könne (Urteil, Rn. 278). Das ist unzutreffend.

943        Die Anwendung der FiFo-Methode zur Begründung eines Anspruchs nach § 37b Abs. 1 WpHG a.F. ist nach schadensersatzrechtlichen Grundsätzen unvertretbar (Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 14 ff.).

944   aa)  Der Gesetzgeber hat die FiFo-Methode lediglich vereinzelt – etwa in § 20 Abs. 4 S. 7 EStG – allein zur Durchsetzung des Fiskalinteresses und zur Vereinfachung der Meldung durch die depotführenden Banken vorgesehen. Die FiFo-Methode findet also nicht einmal im Steuer- oder Bilanzrecht allgemein Anwendung. Eine über die begrenzten, steuerrechtlichen Einzelfälle hinausgehende "allgemeine" gesetzgeberische Wertung für die Anwendung der FiFo-Methode gar im Schadensersatz- und Kapitalmarktrecht lässt sich mithin nicht begründen (dazu ausführlich Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 16 ff.; gegen Urteil, Rn. 277). Eine Methode, die aus fiskalischen Interessen angewendet wird, kann nicht auf das allgemeine Schadensersatzrecht übertragen werden (Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 17 ff.).

945        Die FiFo-Methode bildet im Rahmen von § 20 Abs. 4 S. 7 EStG sowie auch im Bilanz- und Bilanzsteuerrecht vielmehr eine (eng begrenzte) Ausnahme (Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 21 ff., 24 ff.). Eine Übertragung der FiFo-Methode auf die grundsätzlich andere gesetzgeberische Ziele verfolgenden §§ 37 b, c WpHG a.F. in Verbindung mit §§ 249 ff. BGB scheidet aus (Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 27 ff.).

946   bb)  Die FiFo-Methode würde zugunsten eines Anspruchstellers stets zu einem größtmöglichen Schaden und einer Überkompensation führen.

Nimmt ein Anspruchsteller während der Desinformationsphase Aktienverkäufe vor, würden diese nach der FiFo-Methode immer zunächst auf einen bereits vor der Desinformationsphase bestehenden Altbestand von Aktien, und nicht auf die während der Desinformationsphase gekauften Aktien angerechnet. Damit würden auch solche Aktien anspruchserhöhend in die Schadensberechnung einbezogen, die der Anleger *während* der Desinformationsphase ge- *und* verkauft hat. In Bezug auf diese Aktien ist dem Anleger kein Schaden entstanden. Dem Anleger diesbezüglich trotzdem Schadensersatz zu gewähren wäre ein Verstoß gegen das im Schadensersatzrecht geltende strikte Bereicherungsverbot. Die Anwendung der FiFo-Methode auf das Schadensersatzrecht wäre systemwidrig (Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 31 ff.).

947    cc)    Die FiFo-Methode ist mit der Darlegungs- und Beweislastverteilung der Zivilprozessordnung unvereinbar (Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 39 ff.). Sie würde zudem Altaktionäre (also den Aktionären, die ihre Aktien vor Beginn der Desinformationsphase erworben haben) mit Nachinvestitionen (in der angeblichen Desinformationsphase) gegenüber Altaktionären ohne Nachinvestitionen sowie Neuaktionäre mit Altinvestment gegenüber Neuaktionären ohne Altinvestment übervorteilen. Nur Altaktionäre mit Nachinvestitionen und Neuaktionäre mit Altinvestment könnten sich auf die (nicht bestehende) Vermutungsregel der FiFo-Methode berufen. Alle anderen Alt- und Neuaktionäre müssten hingegen ihrer normalen Darlegungs- und Beweislast genügen. Es gibt aber keinen Grund für eine solche Ungleichbehandlung von Alt- bzw. Neuaktionären untereinander (Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 43 ff., 46).

948    dd)    Wollte man einem Anspruchsteller entgegen den zivilprozessualen Darlegungs- und Beweisregeln eine pauschalierende Betrachtung von Aktienkäufen und -verkäufen bei §§ 37b, 37c WpHG a.F. gestatten, käme allenfalls die "Last-in-First-out-Methode" ("LiFo-Methode") in Betracht. Die LiFo-Methode würde die Nachteile der FiFo-Methode vermeiden und am ehesten dem Mindestschadensprinzip gerecht werden (Schriftsatz der Beklagten vom 5. Januar 2018, Rn. 49 ff.). Einem Kläger bliebe es dabei unbenommen, einen kon-

kreten Nachweis zu erbringen, dass im Einzelfall doch andere Aktien verkauft wurden.

949    e)    Die vom Landgericht vertretene These, dass ein (vermeintliches) Wahlrecht nach § 262 BGB bei Aktienverkäufen vorliegend die Darlegung und den Beweis eines angeblichen Schadensersatzanspruchs erleichtert, ist unhaltbar (gegen Urteil, Rn. 280).

950    Die Annahme eines Wahlrechts nach § 262 BGB ist unzutreffend. Eine Wahlschuld im Sinne von § 262 BGB liegt nur vor, wenn mehrere *verschiedene Leistungen* in der Weise geschuldet werden, dass nach späterer Wahl nur eine von ihnen zu erbringen ist.

        Palandt-Grüneberg, BGB, Komm., 78. Aufl., § 262 Rn. 1.

951    Das ist bei einem Aktienverkauf einer *bestimmten* Vorzugsaktie nicht der Fall. Der Schuldner kann dabei nicht zwischen mehreren unterschiedlichen Leistungsgegenständen wählen.

952    Selbst wenn man bei einem Aktienverkauf eine Wahlschuld nach § 262 BGB annehmen wollte (*quod non*), würde sich ein solches Wahlrecht nicht bei der Begründung eines späteren Schadensersatzanspruchs nach § 37b Abs. 1 WpHG a.F. auswirken. Die Klägerseite hätte auch in diesem Fall zur Begründung eines Schadensersatzanspruchs nach § 37b Abs. 1 WpHG a.F. darlegen *und beweisen müssen*, inwieweit sie bei den Aktienverkäufen ein angebliches Wahlrecht ausgeübt hat und welche Aktien veräußert wurden. Das hat die Klägerseite nicht getan.

953    Die Beklagte bestreitet mit Nichtwissen, dass bei den streitgegenständlichen Aktienverkäufen der Klägerseite Vorzugsaktien aus dem "Anfangsbestand" veräußert wurden (gegen Urteil, Rn. 280). Das Landgericht unterstellt dies schlicht zum Nachteil der Beklagten, obwohl die Klägerseite hierfür keinen Beweis vorlegt.

954    Die Klägerseite hat eine angebliche Anspruchsberechtigung gemäß § 37b Abs. 1 Nr. 1 WpHG a.F. folglich nicht dargelegt und belegt. Die Klage ist auch deshalb unschlüssig. Das Urteil beruht auf der rechtsfehlerhaften Annahme einer Aktivlegitimation der Klägerseite.

> teressen der börsennotierten Unternehmen und ihrer Aktionäre abzugrenzen. Dabei zeigt sich, dass Schadensersatzansprüche nicht schrankenlos gewährt werden können, ohne die wirtschaftliche Leistungsfähigkeit eines Unternehmens u.U. zu überfordern. Eine solche Überforderung würde im Ergebnis dazu führen, das Interesse der Anleger als Anteilseigner eines Unternehmens zu beeinträchtigen."
>
> Diskussionsentwurf des Finanzministeriums zum Vierten Finanzmarktförderungsgesetz, vom 4. September 2001, ZBB 2001, 398, 432 f.

1055 Diesem Interesse wird allein eine Auslegung des Gesetzes gerecht, wonach der Kursdifferenzschaden nicht den Kollateralschaden umfasst. Eine solche Auslegung verhindert eine nicht gerechtfertigte Belastung des Emittenten, eine übermäßige, nicht gerechtfertigte Belastung der Altaktionäre und eine Überkompensation der Neuaktionäre.

1056 Dementsprechend vertreten auch zahlreiche Stimmen in der Literatur, dass der Kollateralschaden nicht in den Kursdifferenzschaden mit einzubeziehen ist.

> Klöhn/Rothermund, ZBB 2015, 73, 77; Klöhn, ZIP 2015, 53, 58; Klöhn, ZIP 2015, 1153, 1155; Dirigo, Haftung für fehlerhafte Ad-hoc-Publizität, 171 ff; MünchKommBGB-Wagner, 7. Aufl., § 826 Rn. 114; Richter, Schadenszurechnung bei der deliktischen Haftung für fehlerhafte Sekundärmarktinformation, 2012, 69; Rimbeck, Rechtsfolgen fehlerhafter Ad-hoc-Mitteilungen im deutschen und US-amerikanischen Recht, 154; Hopt/Voigt, Prospekt- und Kapitalmarktinformationshaftung, 112 f; Hellgardt, Kapitalmarktdeliktsrecht, 507.

5. Rechtsfehlerhafte Nichtberücksichtigung von Verkäufen von Vorzugsaktien der Beklagten in der vermeintlichen Desinformationsphase

1057 Das Landgericht hat einen vermeintlichen Schaden der Kläger damit begründet, dass der Kurs der Vorzugsaktien der Beklagten zwischen dem 23. Mai 2014 und dem 18. September 2015 angeblich überhöht

war. Die Kläger hätten daher für Aktienkäufe in diesem Zeitraum zu viel bezahlt.

1058   Die Kläger hätten von einem überhöhten Kurs (*quod non*) indes nicht nur Nachteile gehabt. Sie haben im August und September 2015 erhebliche Aktienbestände *verkauft*. Hätte der Kurs der Vorzugsaktie der Beklagten in diesem Zeitraum, wie vom Landgericht angenommen, um 14,546322 % niedriger gelegen, hätten die Kläger einen entsprechend niedrigeren Kaufpreis erzielt. Das hätte das Landgericht bei seiner Schadensberechnung berücksichtigen müssen.

1059   a)   Die Klägerin zu 1 hat am 19. und 21. August sowie am 17. September 2015 insgesamt 27.858 Vorzugsaktien der Beklagten zu einem Preis von insgesamt EUR 1.766.980,87 verkauft. Die Klägerin zu 2 hat an denselben Tagen 14.351 Vorzugsaktien der Beklagten zum Preis von EUR 910.257,40 verkauft (Anlage K 46).

1060   Hätte der Börsenkurs der Vorzugsaktie der Beklagten an diesen Tagen jeweils um 14,546322 % niedriger gelegen (was nach Auffassung des Landgerichts bei vermeintlich ordnungsgemäßer Ad-hoc-Publizität der Beklagten der Fall gewesen wäre), hätte die Klägerin zu 1 für die Aktienverkäufe lediglich einen Kaufpreis von EUR 1.509.950,14 erzielen können. Die Klägerin zu 2 hätte lediglich EUR 777.848,43 vereinnahmen können.

Beweis:   Sachverständigengutachten

1061   Die Klägerin zu 1 hätte im Hinblick auf ihre Aktienverkäufe mithin in Höhe von EUR 257.030,73, die Klägerin zu 2 in Höhe von EUR 132.408,97 von dem vermeintlich überhöhten Kurs der Vorzugsaktie der Beklagten profitiert.

Beweis:   wie vor

1062   b)   Diese Vorteile waren den Klägern bereits im Rahmen der Schadensberechnung nach der Differenzhypothese auf ihren vermeintlichen Schaden anzurechnen.

1063 aa) Jede Schadensberechnung hat auf der Grundlage der schadensrechtlichen Differenzhypothese zu erfolgen. Bei der Differenzhypothese handelt es sich um einen allgemeinen schadensrechtlichen Grundsatz der §§ 249 ff. BGB.

MünchKommBGB-Oetker, 7. Aufl., § 249 Rn. 18 ff.

1064 Die Differenzhypothese erfordert einen Vergleich zwischen dem tatsächlichen Vermögen des Anspruchstellers und der Vermögenssituation, die sich ohne die behauptete Pflichtverletzung eingestellt hätte.

MünchKommBGB-Oetker, 7. Aufl., § 249 Rn. 18 ff.

1065 In die danach aufzustellende Vergleichsrechnung sind *alle* Vermögenspositionen des vermeintlich Geschädigten einzustellen, die von dem haftungsbegründenden Ereignis betroffen sind. Der Bundesgerichtshof hat diesen Grundsatz noch im Jahr 2015 wie folgt konkretisiert und bekräftigt:

"Der gegebenenfalls zu ersetzende Schaden ist durch einen Vergleich der infolge des haftungsbegründenden Ereignisses eingetretenen Vermögenslage mit derjenigen Vermögenslage zu ermitteln, die ohne jenes Ereignis eingetreten wäre [*Nachweise*]. Dies erfordert einen *Gesamtvermögensvergleich*, der *alle von dem haftungsbegründenden Ereignis betroffenen finanziellen Positionen umfasst.*" (Hervorh. d.U.)

BGH, NJW 2015, 1373, 1374 (juris, Rn. 7).

1066 Einen Gesamtvermögensvergleich stellt es nicht dar, wenn für Zwecke der Schadensberechnung lediglich Einzelpositionen herausgegriffen werden, die neben anderen Einzelpositionen von dem schadensbegründenden Ereignis betroffen sind. Auch das hat der Bundesgerichtshof unmissverständlich klargestellt:

"Es geht bei dem Gesamtvermögensvergleich *nicht um Einzelpositionen*, sondern um eine Gegenüberstellung der hypothetischen und der tatsächlichen Vermögenslage". (Hervorh. d.U.)

BGH, NJW 2015, 1373, 1374 (juris, Rn. 7).

1067            Das haftungsbegründende Ereignis wäre vorliegend die Nichtveröffentlichung einer angeblich erforderlichen Ad-hoc-Mitteilung und der dadurch angeblich überhöhte Börsenkurs. In den Gesamtvermögensvergleich sind mithin alle von der Nichtveröffentlichung und dem (angeblich) verfälschten Kursniveau betroffenen finanziellen Positionen des vermeintlich Geschädigten einzustellen und zu saldieren.

1068     bb)    Zu den maßgeblichen Positionen gehören jedenfalls neben den Käufen auch die Verkäufe des streitgegenständlichen Finanzinstruments (hier der Vorzugsaktie der Beklagten) im Desinformationszeitraum. Sowohl Käufe als auch Verkäufe von Vorzugsaktien der Beklagten wären von der Nichtveröffentlichung der Ad-hoc-Mitteilung der Beklagten und dem dadurch angeblich überhöhten Kurs gleichermaßen unmittelbar und mechanisch betroffen. Aktien*käufe* in der Desinformationsphase gehen dabei vermögensmindernd in den Gesamtvermögensvergleich ein, da sie bei (vermeintlich) pflichtgemäßer Veröffentlichung zu einem angeblich geringeren Preis getätigt worden wären. Aktien*verkäufe* wirken sich vermögenssteigernd aus. Die Kläger hätten Verkäufe nach einer vermeintlich pflichtgemäßen Ad-hoc-Mitteilung nur zu einem geringeren Preis tätigen können.

1069     c)    Zum gleichen Ergebnis gelangt man, wenn man die Anrechnung von Vorteilen aus der Veräußerung von Aktien in der Desinformationsphase nicht nach Maßgabe der Differenzhypothese berücksichtigen wollte. Dann wären solche Vorteile nach den Regeln des Vorteilsausgleichs auf einen behaupteten Schaden der Kläger anzurechnen.

1070     aa)    Vorteile aus Transaktionen sind dann auf Verluste aus anderen Transaktionen anzurechnen, wenn sie (i) adäquat kausal durch das schädigende Ereignis verursacht wurden und (ii) ein qualifizierter Zusammenhang im Sinne einer "Verklammerung" der Transaktionen besteht.

                                                   BGH, WM 2018, 2179, 2181 (juris, Rn. 17 ff.) m.w.N.

1071   Das Merkmal der adäquat kausalen Verursachung ist vorliegend im Hinblick auf alle Transaktionen, die ein Anleger im Desinformationszeitraum tätigt, unproblematisch erfüllt. Ebenso wie sich der (vermeintlich) überhöhte Kurs bei allen Kauftransaktionen negativ auf das Vermögen des Anlegers auswirken, wirkt sich der überhöhte Kurs bei allen Verkaufstransaktionen positiv auf das Vermögen des Anlegers aus.

      Beweis:    Sachverständigengutachten

1072   bb)   Hinsichtlich der Anforderungen an die erforderliche Verklammerung von Vor- und Nachteilen hat der Bundesgerichtshof die Rechtslage in seinem Urteil vom 18. Oktober 2018 klargestellt. Danach scheidet eine Verklammerung *nicht* schon dann aus, wenn der fragliche Vorteil aus einer anderen Transaktion stammt als der geltend gemachte Nachteil. Vielmehr kommt es auf eine Gesamtwürdigung im Einzelfall an, bei der (i) die schadensbegründende Pflichtverletzung des Schädigers und (ii) die Anlageentscheidung des Anlegers in den Blick zu nehmen sind.

      BGH, WM 2018, 2179, 2180 f. (juris, Rn. 15 ff.).

1073   Im entschiedenen Fall hat der Bundesgerichtshof eine Anrechnung von Vorteilen aus dem Erwerb eines Fonds auf Nachteile aus dem Erwerb eines anderen Fonds zugelassen, weil

– die Zeichnung beider Fonds auf der Grundlage eines einheitlichen Beratungsgesprächs erfolgte,

– der Beratungsfehler beide Anlagen in identischer Weise betraf,

– es sich um gleichartige Anlagen handelte und

– beiden Anlagen ein umfassendes Anlagekonzept und eine Gesamtentscheidung des dortigen Klägers zugrunde lag.

      BGH, WM 2018, 2179, 2182 (juris, Rn. 28).

1074   Die Entscheidung des Bundesgerichtshofs vom 18. Oktober 2018 kann auf die vorliegende Konstellation nicht ohne weiteres übertra-

gen werden. In diesen Entscheidungen wird die Frage der Verklammerung maßgeblich mit Blick auf die dort streitgegenständliche *Anlageberatung* beantwortet. Um Anlageberatung geht es hier aber nicht.

1075 Gleichwohl lassen sich der Rechtsprechung Grundsätze entnehmen, die auch vorliegend zu einer Vorteilsausgleichung führen:

1076 (1) Soweit der Bundesgerichtshof auf die Zeichnung der Anlagen auf der Grundlage eines einheitlichen Beratungsgesprächs abstellt, geht es ihm um die *Nämlichkeit des Schadensereignisses* im Hinblick auf Vor- und Nachteile. In diesem Sinne hat der Bundesgerichtshof bereits zur Verrechenbarkeit von Vor- und Nachteilen aus verschiedenen Swap-Verträgen entschieden:

> "Ist Schadensereignis eine Beratungspflichtverletzung anlässlich des Abschlusses konkreter Swap-Geschäfte, können Vorteile, die aus zu anderen Zeiten geschlossenen Swap-Verträgen aufgrund einer gesonderten Beratung resultieren, schon mangels Nämlichkeit des Schadensereignisses im Wege der Vorteilsausgleichung keine Berücksichtigung finden."

BGH, BKR 2016, 291, 295 (juris, Rn. 39).

1077 Ist die Nämlichkeit des Schadensereignisses für Vor- und Nachteile gegeben, kommt ein Vorteilsausgleich dagegen in Betracht.

BGH, WM 2018, 2179 (juris, Rn. 27 ff.).

1078 Die Nämlichkeit des Schadensereignisses ist vorliegend zu bejahen. Das Schadensereignis ist vorliegend kein Beratungsgespräch, sondern eine (vermeintlich) unterlassene Ad-hoc-Mitteilung der Beklagten. Dieses Schadensereignis wirkte sich nicht punktuell auf einzelne Transaktionen aus (wie im Falle einer Anlageberatung oder einer falschen Ad-hoc-Meldung). Die vermeintlich unterlassene Ad-hoc-Mitteilung betraf sämtliche Transaktionen im Desinformationszeitraum ohne jeden Unterschied.

1079 (2) Soweit der Bundesgerichtshof auf die *Identität des Anlagefehlers* für Vor- und Nachteile der Anlagen abstellt, geht es darum, dass nicht

nur das gleiche Beratungsgespräch beiden Anlagen zugrundelag. Es geht um den gleichen Fehler, der sich auf beide Anlagen ausgewirkt hat, bei der vorteilhaften Anlage aber keine nachteiligen Folgen hatte. Im vom Bundesgerichtshof entschiedenen Fall war dieser Fehler die fehlerhafte Aufklärung über ein mögliches Wiederaufleben der Kommanditistenhaftung, die im Hinblick auf beide vom dortigen Kläger gezeichnete Fonds geboten war.

BGH, WM 2018, 2179 (juris, Rn. 27).

1080 Vorliegend wäre nach den (fehlerhaften) Feststellungen des Landgerichts eine Fehleridentität gegeben. Der Fehler wäre vorliegend der (angeblich) überhöhte Kurs, der sich in allen Transaktionen der Kläger in der Desinformationsphase (mal zum Vorteil, mal zum Nachteil der Kläger) ausgewirkt hat.

1081 (3) Eine Gleichartigkeit der Anlageformen ist zu bejahen. Es geht (primär) um Transaktionen mit *derselben Aktie*.

1082 (4) Der Bundesgerichtshof hat schließlich darauf abgestellt, dass im von ihm entschiedenen Fall eine einheitliche Anlageentscheidung im Hinblick auf das vor- und das nachteilige Geschäfte vorlag. Das ist vor dem Hintergrund des Zwecks der dort maßgeblichen Ersatzpflicht – dem Schutz vor fehlerhafter Anlageberatung – folgerichtig.

1083 Auf eine einheitliche Anlageentscheidung des Anlegers kann es vorliegend für die Ermittlung des Vorteilsausgleichs nicht ankommen. Das Landgericht will den Ersatz des Kursdifferenzschadens nicht von einer durch die vermeintlich unterlassene Ad-hoc-Mitteilung der Beklagten veranlassten Anlageentscheidung der Kläger abhängig machen. Maßgeblich für die Anspruchsberechtigung soll allein die Preiskausalität der Unterlassung sein.

1084 Da Zweck der Ersatzpflicht nach § 37b WpHG a.F. *nicht* der Schutz der Anlageentscheidung des Anlegers ist, kann es auch im Rahmen des Vorteilsausgleichs nicht auf die Anlageentscheidung ankommen. Auch wenn den Transaktionen verschiedene Anlageentscheidungen zugrunde lägen, würde eine Anrechnung dem Zweck der Ersatz-

pflicht (die eben nicht im Schutz der Anlageentscheidung läge) nicht entgegenstehen.

1085    cc) Sollte gleichwohl auch in der vorliegenden Konstellation eine einheitliche Anlageentscheidung (oder andere kongruenzbegründende Merkmale) für den Vorteilsausgleich zu fordern sein, wäre auch dieses Kriterium im Hinblick auf die Kläger erfüllt.

1086    Die Kläger sind Investmentfonds. Sie haben über Monate hinweg fast täglich fünfstellige Stückzahlen an Vorzugsaktien der Beklagten gehandelt. Es ist ausgeschlossen, dass es sich dabei jeweils um eigenständig motivierte Transaktionen handelte. Vielmehr liegt allen Transaktionen eine einheitliche Anlagestrategie gemäß den Fondsbedingungen der Kläger zugrunde.

       Beweis:     Sachverständigengutachten

6. Berechnung des Landgerichts enthält finanzmathematische Fehler

1087    Die Berechnung des Einzelrichters enthält weitere einfache Rechenfehler: Zum Beispiel überträgt der Einzelrichter die von ihm (unzutreffend) ermittelte Ankündigungsrendite des 22. September 2015 (14,546322 %) so auf die Transaktionen des Klägers, als wären sie arithmetische Renditen. Der Einzelrichter multipliziert den gezahlten Erwerbspreis schlicht mit dieser Rendite (Urteil, Rn. 315 f.).

1088    Bei der vom Einzelrichter ermittelten Ankündigungsrendite handelt es sich jedoch um eine logarithmierte Rendite. Auf der Basis der (unzutreffenden) Annahmen des Landgerichts läge die entsprechende arithmetische Rendite (die für die Multiplikation mit dem gezahlten Erwerbspreis hätte verwendet werden müssen) bei lediglich 13,537831 %.

       Beweis:     Sachverständigengutachten

1089    Schon dieses Beispiel belegt, dass der Einzelrichter nicht aufgrund angemaßter Sachkunde die Sachverständigenbeweisangebote der Parteien zum Kursdifferenzschaden übergehen durfte. Das Urteil ist