Exhibit G

# HENGELER MUELLER

Hengeler Mueller · Postfach 17 04 18 · 60078 Frankfurt am Main

An das
Oberlandesgericht Stuttgart
1. Zivilsenat
Olgastraße 2
70182 Stuttgart

Dr. Markus Meier
Partner

Dr. Philipp Hanfland
Partner

Direktwahl
Direct Number
+49 69 17095-370

E-Mail der Absender
Senders' E-mail
markus.meier@hengeler.com
philipp.hanfland@hengeler.com

Bockenheimer Landstraße 24
60323 Frankfurt am Main
Telefon +49 69 17095-0
Telefax +49 69 17095-099
www.hengeler.com

Frankfurt am Main, 25. Februar 2019
90727572v1

## Berufungsbegründung

In Sachen

1.  Greenwich (Japan) Limited
2.  Gateshead (Japan) LLC

RAe Broich, Frankfurt am Main

gegen

Porsche Automobil Holding SE

RAe Hengeler Mueller, Frankfurt am Main
RAe Dres. Markus Meier und Philipp Hanfland

### - 1 U 205/18 -

danken wir für die gewährte Fristverlängerung. Namens und in Vollmacht der Beklagten und Berufungsklägerin (nachfolgend "Beklagte") wird beantragt,

1.  unter teilweiser Abänderung des Urteils des Landgerichts vom 24. Oktober 2018 – Az. 22 O 348/16 – die Klage insgesamt abzuweisen;

BERLIN · DÜSSELDORF · FRANKFURT · MÜNCHEN · BRÜSSEL · LONDON · SHANGHAI
Partnerschaft von Rechtsanwälten mbB, Sitz Berlin, AG Berlin-Charlottenburg PR291

HENGELER MUELLER                                                                          238

|  | Beweis: | Geschäftsbericht Rumpfgeschäftsjahr 2010 der Beklagten (Auszug), S. 5, 38 |

- Anlage B 127 -

928    Dem Geschäftsbericht für das Rumpfgeschäftsjahr 2010 folgte der Halbjahresfinanzbericht zum 30. Juni 2011. Dieser enthielt einen Konzern-Zwischenlagebericht.

Beweis:    Halbjahresfinanzbericht der Beklagten zum 30. Juni 2011 (Auszug), S. 1 ff.

- Anlage B 128 -

929    Es folgten weitere Geschäfts- und Halbjahresfinanzberichte, die die vom Landgericht als nachträglich unrichtig beanstandeten Informationen im Geschäftsbericht 2009/2010 weiter haben in den Hintergrund treten lassen.

930    Im Mai 2014 waren die Angaben aus dem Konzernlagebericht 2009/2010 in jedem Fall längst überholt. Sie konnten nicht mehr Anknüpfungspunkt für eine Berichtigungspflicht sein und schon gar nicht mehr für eine kapitalmarktrechtliche Informationshaftung.

**I.    District Court's legally erroneous assumption of cogent demonstration of the plaintiff's side's standing to sue**

931    The regional court has further assumed an alleged right to sue by the Plaintiff, wrongly interpreting the law (appeal, side no. 274). The Plaintiffs failed to conclusively show their authorization for raising the claim for compensation of potential damages pursuant to Section 37b para. 1 no. 1 WpHG a.F. (Securities Trading Act, old version).

932    a) According to Section 37b para. 1 no. 1 WpHG a.F. any third party is only authorized to raise claims

"(…) if the third party purchases *the* financial instruments after the omission and during the disclosure of the insider information is still the owner of *the* financial instruments (…)" emphasis added.

HENGELER MUELLER

933    The wording of the standard emphasizes that an investor must have been the owner of *the financial instruments in question* over the entire period. The legal wording requires ownership of the concrete stocks purchased during the disinformation phase at the end of said disinformation phase (cf. here already the writ of the Defendant dated January 5, 2018, side no. 4 et seq.) An even more distinct wording as expected by the Regional Court would be unnecessary (appeal, side no. 279). If the legislator intended that an applicant only needed to be the owner of any shares of an issuer, this would have been indicated with a more abstract wording (for example "upon disclosure of the insider information still owner *of* financial instruments").

934    Any claim pursuant to Section 37b para. 1 no. 1 WpHG a.F. requires therefore that the applicant, at the time of the alleged insider information becoming known, was still the owner of said here disputed preferred stock of the Defendant.

> cf. KölnKomm WpHG-Möllers/Leisch, 2nd edition, Sections 37b, c side no. 217; Baumbach/Hopt-Kumpan, HGB, Comm., 37th edition, Section 37b, WpHG, side no. 3; Just/Voß/Ritz/Becker-Bruchwitz, WpHG, Comm., 2015, Section 37b, 37c, side no. 35; Fuchs-Fuchs, WpHG, Comm., 2nd edition, Section 37c, side no. 21.

935    Consequently the Plaintiffs have to show for each individual, allegedly purchased preferred stock of the Defendant in dispute here and perhaps also prove that these very preferred stocks were still owned at the time the alleged insider information become known. The Plaintiffs failed to do that regarding the stocks allegedly purchased in the period from June 3, 2014 to July 6, 2015. For precautionary reasons, ignorance is pled that the Plaintiffs, upon learning of the alleged insider information, were still holding the very preferred stocks of the Defendant in dispute.

936    Rather, both the Plaintiff no. 1 as well as the Plaintiff no. 2 *sold* undisputedly 27,858 and 14,351, respectively preferred shares of the Defendant during the alleged disinformation phase. Here it is not discernible which stock was sold concretely and if they represented the shares allegedly underlying the claims raised.

HengelerMueller

937   A concrete allocation of stock purchases and sales is mandatory for reviewing any damage within the scope of Sections 37b, c, WpHG a.F., (see here already the writ of the Defendant dated January 5, 2018, side no. 7 et seq.). When the investor demands compensation for the price difference, here the investor must show and prove that the market price *at the respective time of purchase* of the shares in dispute was excessive.

> BGH, NJW 2012, 1800 (IKB; juris, side no. 67); Köln-KommWpHG-Möllers/Leisch, 2nd edition, Sections 37b, c side no. 478.

938   Both the existence as well as the amount of the potential damage from any price difference depends for each share largely on the fact *when* the stock was purchased. This applies particularly when, as assumed by the regional court (judgement, side no. 288) misinterpreting the law, the price difference was assessed as a percentage of the respective market price (changing from day to day) (see here bottom side no. 991 et seq.) Using this calculation method would result in a different damage based on the price difference from one day to the next.

939   c)   An allocation of stock purchases and sales by the Plaintiffs is possible. The Plaintiffs have the burden of proof. This burden of proof was not met by the Plaintiffs.

940   The Plaintiffs disclosed some sales in their securities invoices presented (Exhibit K 46). The invoices however fail to allow drawing any conclusions which of the previously purchased preferred stock of the Defendants in question had allegedly been sold by the Plaintiffs.

941   Thus the complaint is inconclusive. In any case, the undoubtedly performed sales had to be deducted from the preferred stock allegedly underlying the claim for compensation of damages and purchased during the alleged disinformation phase.

HENGELER MUELLER                                                    241

942    The regional court has used the "first-in-first-out" method (fifo-method) resulting in a
       disadvantage of the Defendant and thus ignored the undoubtedly conducted sales during the
       alleged disinformation phase (judgment, side no. 277 et seq.) The regional court states the
       opinion that the fifo-method was "accepted" by the legislator such that it could be used "generally
       also when calculating the damage and the right to sue in question, here" (judgment, side no. 278).
       This is incorrect.

943    The application of the fifo-method to reason a claim pursuant to Section 37b para. 1 WpHG a.F.
       is unwarranted according to generally accepted principles of compensation of damages law (writ
       of the Defendant dated January 5, 2018, side no. 14 et seq.).

944    aa)      The legislator has only in individual cases accepted the fifo-method, for example in
       Section 20 para. 4 p. 7 EStG (income tax act), for enforcing fiscal interests and to simplify the
       reporting by the depository banks. The fifo-method is not even generally used in fiscal or
       balancing law. Any "general" valuation by the legislator exceeding the limited fiscal individual
       cases for application of the fifa-method even for cases of compensation of damages and capital
       market law cannot be reasoned thereby (see here in detail the writ of the Defendant dated January
       5, 2018, side no. 16 et seq.; appeal, side no. 277). A method applicable for fiscal interests cannot
       be transferred to the general law for compensation of damages (writ of the Defendant dated
       January 5, 2018, side no. 17 et seq.)

945    Within the scope of Section 20 para. 4 p. 7 EStG as well as the balancing and balance-sheet tax
       law the fifo-method rather represents a (narrowly limited) exception (writ of the Defendant dated
       January 5, 2018, side no. 21 et seq.). Any application of the fifo-method to Section 37b, c WpHG
       a.F., generally focusing on different goals of the legislator, in conjunction with Sections 249 et
       seq. BGB is excluded (writ of the Defendant dated January 5, 2018, side no. 27 et seq.).

946    bb)      The fifo-method would also lead to a maximum damage in favor of an applicant and
       overcompensation.

HENGELER MUELLER                                              242

In the event the applicant performs any stock purchases during the disinformation phase, based on the fifo-method they would always be initially allocated to a portfolio of shares already existing prior to the disinformation phase, and not to those shares purchased during the disinformation phase. Therefore even those shares would be included in the calculation of damages which the investor had purchased and sold *during* the disinformation phase. With regard to these shares, the investor suffered no damages. Granting to the investor in spite thereof compensation of damages would represent a violation of the strict ban of profiting which applies to the compensation of damages law. The application of the fifo-method upon the compensation of damages law would violate the system (writ of the Defendants dated January 5, 2018, side no. 31 et seq.).

947     cc)     The fifo-method is inconsistent with the distribution of proof and verification of the code of civil proceedings (writ of the Defendant dated January 5, 2018, side no. 39 et seq.) It would also excessively benefit old shareholders (thus the shareholders who had purchased their stock prior to the onset of the disinformation phase) who later made additional investments (within the alleged disinformation phase) in reference to old shareholders without such later investments as well as new investors with old investments in reference with new investments without old investments. Only old investors with subsequent investments and new shareholders with old investments could claim the (non-existing) assumption rule of the fifo-method. All other old and new shareholders had to be satisfied with their standard burden of proof and verification. However, there is no reason for such an unequal treatment of old and/or new shareholders in reference to each other (writ of the Defendants dated January 5, 2018, side no. 43 et seq., 46).

948     dd)     If one applicant was allowed, contrary to the rules of proof and verification common in civil proceedings, to present a generalizing assessment of stock purchases and sales based on Sections 37b, 37c WpHG a.F., at best the last-in-first-out method ("lifo-method) could be considered. The lifo-method would avoid the disadvantages of the fifo-method and best approach the principle of minimum damages (writ of the Defendants dated January 5, 2018, side no. 48 et seq.). Here, a Plaintiff still had the option to present concrete proof that in the individual case other shocks had been sold.

HENGELER MUELLER                                                      243

949   e)      The hypothesis stated by the regional court that an (alleged) option given pursuant to
Section 262 BGB for stock sales facilitated the interpretation and the proof of alleged claims for
compensation of damages cannot be upheld (appeal, side no. 280).

950   The assumption of an option pursuant to Section 262 BGB is incorrect. Any default by selection
in the sense of Section 262 BGB is only given if several *different services* were due in such a case
that any later option can only be provided by one of them.

Palandt-Grüneberg, BGB, comm. 78th edition, Section 262 side no. 1.

951   This is not the case when a *certain* preferred share is sold. The debtor cannot select from several
different service objects.

952   Even if a default by selection was assumed in stock sales pursuant to Section 262 BGB, (*quod
non*), such an option would not impact any reason for a later claim for damages pursuant to
Section 37b para. 1 WpHG a.F. The Defendants in this case also had to present reasons to
substantiate a claim for compensation of damages pursuant to Section 37b para. 1 WpHG a.F. *and
had to prove* to what extent an alleged option was exercised during the stock sales and which
shares had been sold. This was not done by the Plaintiffs.

953   The Defendants pleads ignorance that in the stock sales of the Plaintiffs in question here preferred
stock from the "initial inventory" was sold (appeal, side no. 280). The regional court simply
assumes that on expense of the Defendants, although the Plaintiffs fail to present proof thereof.

954   The Plaintiffs therefore failed to prove and verify a right to sue for the claim pursuant to Section
37b para. 1 no. 1 WpHG a.F. The complaint is therefore inconclusive. The judgment is based on
the faulty assumption of a right to sue of the Plaintiffs.

HENGELER MUELLER                                                    267

teressen der börsennotierten Unternehmen und ihrer Aktio-
näre abzugrenzen. Dabei zeigt sich, dass Schadensersatzan-
sprüche nicht schrankenlos gewährt werden können, ohne die
wirtschaftliche Leistungsfähigkeit eines Unternehmens u.U.
zu überfordern. Eine solche Überforderung würde im Er-
gebnis dazu führen, das Interesse der Anleger als Anteils-
eigner eines Unternehmens zu beeinträchtigen."

Diskussionsentwurf des Finanzministeriums zum Vierten
Finanzmarktförderungsgesetz, vom 4. September 2001, ZBB
2001, 398, 432 f.

1055   Diesem Interesse wird allein eine Auslegung des Gesetzes gerecht,
wonach der Kursdifferenzschaden nicht den Kollateralschaden
umfasst. Eine solche Auslegung verhindert eine nicht gerechtfertigte
Belastung des Emittenten, eine übermäßige, nicht gerechtfertigte Be-
lastung der Altaktionäre und eine Überkompensation der Neuaktio-
näre.

1056   Dementsprechend vertreten auch zahlreiche Stimmen in der
Literatur, dass der Kollateralschaden nicht in den Kursdifferenzscha-
den mit einzubeziehen ist.

Klöhn/Rothermund, ZBB 2015, 73, 77; Klöhn, ZIP 2015, 53,
58; Klöhn, ZIP 2015, 1153, 1155; Dirigo, Haftung für
fehlerhafte Ad-hoc-Publizität, 171 ff; MünchKommBGB-
Wagner, 7. Aufl., § 826 Rn. 114; Richter, Schadens-
zurechnung bei der deliktischen Haftung für fehlerhafte
Sekundärmarktinformation, 2012, 69; Rimbeck, Rechtsfolgen
fehlerhafter Ad-hoc-Mitteilungen im deutschen und US-
amerikanischen Recht, 154; Hopt/Voigt, Prospekt- und
Kapitalmarktinformationshaftung, 112 f; Hellgardt, Kapital-
marktdeliktsrecht, 507.

### 5.   Legally erroneous failure to consider sales of preferred shares of the defendant in the alleged disinformation phase

1057   The regional court has reasoned an alleged damage of the Plaintiffs such that the price of the preferred stock of the Defendant between May 23, 2014 and September 18, 2015 was allegedly excessive. The Plaintiffs had therefore paid too much for their stock purchases in this period.

HENGELER MUELLER                                                    268

1058   The Plaintiffs had however not only disadvantages from an excessive price (*quod non*). In August and September 2015 they had allegedly *sold* considerable stock assets. If the price of the preferred stock of the Defendant in this period, as assumed by the regional court, had been lower by 14.546322%, the Plaintiffs had yielded an accordingly lower sales price. This had to be considered by the regional court when calculating the damages.

1059   a)       The Plaintiff no. 1 had sold on August 19 and 21, as well as on September 17, 2015 a total of 27,858 preferred shares of the Defendant for a price of totaling EUR 1,766,980.87. The Plaintiff no. 2 had sold at the same dates 14,351 preferred shares of the Defendant for a price of totaling EUR 910,257.40 (Exhibit K 46).

1060   If the market price of the preferred stock of the Defendant at these days had been lower by respectively 14,546322 % (which would have been the case in the opinion of the regional court in case of alleged proper ad hoc publication by the Defendant) the Plaintiff no. 1 could have only yielded a purchase price of EUR 1,509,950.14 for the stock sales. The Plaintiff no. 2 could have only yielded EUR 777,848.43.

        <u>Proof</u>:   Expert opinion

1061   The Plaintiff no. 1 had therefore profited with regards to stock sales in the amount of EUR 258,030.73, the Plaintiff no. 2 in the amount of EUR 132,408.97 from the alleged excessive market price of the preferred stock of the Defendant.

        <u>Proof</u>:   see above

1062   b)       The advantages were already to be compensated for the Plaintiffs within the scope of the calculation of damages according to the balance theory.

1063      aa)     Each calculation of damages must occur based on the balance theory of damage law. The balance theory represents a general principle of damage law pursuant to Sections 249 et seq. BGB.

MünchKommBGB-Oetker, 7th edition, Section 249 side no. 18 et seq.

1064      The balance theory requires a comparison of the actual assets of the claiming party with the asset situation which would have resulted without the alleged violation of obligations.

MünchKommBGB-Oetker, 7th edition, Section 249 side no. 18 et seq.

1065      In the comparative calculation to be prepared here *all* asset positions of the allegedly damaged party must be considered, which are affected by the event underlying the claim for liability. The Federal Court of Justice has further defined and emphasized this principle in 2015 as follows:

"The damage perhaps to be compensated is to be determined by a comparison of the asset situation resulting as a consequence of the event underlying the claim for liability with such asset situation, which would have resulted without said event [*proof*]. This requires a *comparison of the entire assets*, which *includes all financial positions affected by the event underlying the claim for liability.*" (emphasis added).

BGH, NJW 2015, 1373, 1374 (juris, side no. 7).

1066      A comparison of overall assets is not given when for the purpose of calculating damages only individual positions are used, which in addition to other individual positions were affected by the event underlying the damaging event. This has also been unambiguously clarified by the Federal Court of Justice.

"The overall comparison of assets refers *not to individual positions,* but to a comparison of the hypothetical and actual asset situation". (emphasis added).

BGH, NJW 2015, 1373, 1374, (juris, side no. 7).

1067   The event underlying the claims for liability would be given in the case at hand in the non-publication of an allegedly required ad-hoc notification and the excessive stock price resulting therefrom. In the overall comparison of assets therefore all financial assets of the allegedly damaged party must be considered and balanced which were affected by the (allegedly) distorted price level.

1068   bb)   The relevant positions include in any case, in addition to the purchases, also the sales of the financial instrument in question (here the preferred stock of the Defendant) within the period of disinformation. Both purchases as well as sales of preferred stock of the Defendant would be equally affected directly and mechanically by the non-publication of the ad-hoc announcement of the Defendant and the thereby allegedly excessive price. Stock *purchases* in the disinformation phase are here considered in an asset-reducing fashion in the overall comparison of assets, since they would have been conducted at (allegedly) duly performed publication at an allegedly lower price. Stock *sales* have an asset increasing effect. The Plaintiff could have executed sales after an alleged duly performed ad-hoc notification only for a lower price.

1069   c)   The same result will develop when the compensation of advantages from the sale of stocks during the disinformation phase was not considered in light of the balance theory. In this case, such advantages were to be compensated with an alleged damage of the Plaintiff according to the generally accepted rules of compensation of advantages.

1070   aa)   Advantages from transactions are then to be compensated with loss from other transactions when they (i) were generated from equivalent causes by the damaging event and (ii) here a qualifying connection is given in the sense of a "linking" between the transactions.

BGH, WM 2018, 2179, 2181 (juris, side no. 17 ff.) with additional notes

HENGELER MUELLER                                                           271

1071    The feature of the generation by adequate causes has been easily fulfilled in the present case with regards to all transactions conducted by an investor within the disinformation period. Just like the (allegedly) excessive price had negative consequences in all purchase transactions upon the assets of the investor, the excessive price had positive effects upon all sales transactions upon the assets of the investor.

<u>Proof</u>:   Expert opinion

1072    bb)    With regards to the requirements for the necessity of linked advantages and disadvantages the Federal Court of Justice has clarified the legal framework in its judgment dated October 18, 2018. Accordingly, a linkage is *not* already excluded when the advantage in question arises from a different transaction than the claimed disadvantage. Rather, an overall assessment is decisive in the individual case in which (i) the violation of obligations underlying the claim for compensation by the damaged party and (ii) the investment decision of the investor must be considered.

BGH, WM 2018, 2179, 2180 et seq. (juris, side no. 15 et seq.)

1073    In the case to be decided the Federal Court of Justice has permitted a compensation of advantages from the purchase of a fund with disadvantages from the purchase of another fund, because

-    the issuance of both funds occurred based on a uniform consulting meeting,

-    the consulting error affected both investments in the same way,

-    there investments were equivalent, and

-    both investments had an underlying comprehensive investment concept and comprehensive decision of the respective Plaintiff.

BGH, WM 2018, 2179, 2182 (juris, side no. 28).

HENGELER MUELLER                                          272

1074    The decision of the Federal Court of Justice dated October 2018 cannot be applied without further
ado to the constellation at hand. In these decisions the question of linkage is answered, which is
relevant with regards to the *investor consulting* which is the matter in dispute. The present case is
not related to investor consulting, though.

1075    However, principles are discernible from jurisprudence which also lead to a compensation of
advantages in the present case.

1076    (1)      To the extent the Federal Court of Justice targets the issuance of investments based on a
uniform consulting meeting, the focus is given to the *identity of the damaging event* with regards
to advantages and disadvantages. In this sense the Federal Court of Justice has decided regarding
the ability to compensate advantages and disadvantages from various swap contracts:

> "If the damaging event represents a violation of consulting obligations based on a
> transaction of concrete swap trades, the advantages resulting from swap contracts
> entered into at a different point of time based on a separate consulting cannot be
> considered already for lack of identity of the damaging event by way of the
> compensation of advantages."

> BGH, BKR 2016, 291, 295 (juris, side no. 39).

1077    If the identity of the damaging event is given for advantages and disadvantages, here a
compensation thereof is possible, though.

> BGH, WM 2018, 2179 (juris, side no. 27 ff.).

1078    The identity of the damaging event is given in the case at hand. The damaging event is in the
present case no consulting meeting but an (alleged) omitted ad-hoc publication by the Defendant.
This damaging event affects not merely individual transactions (as in the case of an investment
consulting or a wrong ad-hoc announcement). The allegedly omitted ad-hoc message related here
equally to all transactions within the disinformation period.

1079    (2)      To the extent the Federal Court of Justice refers to the *identity of the investment error*
concerning advantages and disadvantages, here the focus is given to the fact that not only the
same consulting meeting was underlying the two investments. Rather, here the same error is
discussed, which affected both investments, however had no disadvantageous consequences for
the profitable investment. In the case decided by the Federal Court of Justice this error was a
flawed information provided regarding the potential reactivation of the liability of partners, which
applied to both of the funds issued by the respective Plaintiffs.

HENGELER MUELLER

273

BGH, WM 2018, 2179 (juris, side no. 27).

1080   In the present case, here a faulty identity would be given according to the (erroneous) determinations of the regional court. The error would be in the present case the (allegedly) excessive price which applied to all transactions of the Plaintiff within the disinformation phase (sometimes to the advantage, sometimes to the disadvantage of the Plaintiffs).

1081   (3)      An equivalence of the investment form must be confirmed here. The case relates (primarily) to transactions of the *same stock*.

1082   (4)      The Federal Court of Justice finally focused on the fact that in the case to be decided a uniform investment decision was given with regards to the advantageous and disadvantageous transactions. This is a correct conclusion in light of the purpose of the here relevant obligation for compensation, not the protection from flawed investor consulting.

1083   In the present case a uniform investment decision of the investor cannot be relevant for determining the compensation of advantages. The regional court has no intentions to render the investment decision of the Plaintiffs dependent on an event triggered by the allegedly omitted ad-hoc message of the Defendant. For the justification of any claims here only the price causality of the omission shall be relevant.

1084   Due to the fact that the purpose of the obligation for compensation pursuant to Section 37b WpHG a.F. is *not* the protection of the investment decision of the investor, even within the scope of the compensation of advantages, the investment decision cannot be relevant. Even if different investment decisions were underlying the transactions, any compensation would not be prevented by the purpose of the obligation for compensation (which was not in the interest of protecting the investor decision, either).

1085    cc)    If however in the given constellation a uniform investment decision (or other features justifying equivalency) demanded a compensation of advantages, this criterion would also be fulfilled with regards to the Plaintiffs.

1086    The Plaintiffs are investment funds. For several months they traded preferred stock of the Defendant almost daily on quantities ranging in the dozen of thousand units. It is impossible that they represent separately motivated transactions. Rather, all transactions have an underlying uniform investment strategy based on the fund conditions of the Plaintiffs.

Proof:   Expert opinion

6.    Calculation of the regional court includes errors in financial mathematics

1087    The calculation of the single judge includes also simple computing error: for example the single judge transfers the projected yield he (incorrectly) determined on September 22, 2015 (14,546322 %) to the transactions of the Plaintiff in a manner as if they were arithmetic dividends. The single judge multiplies the purchase price paid simply with this yield (judgment, side no. 315 et seq.)

1088    The projected yield determined by the single judge represents however a logarithmic dividend. Based on the (incorrect) assumption of the regional court the respective arithmetic yield (which had to be used for the multiplication with the purchase price paid) amounts to only 13,537831 %.

Proof:   Expert opinion

1089    Schon dieses Beispiel belegt, dass der Einzelrichter nicht aufgrund angemaßter Sachkunde die Sachverständigenbeweisangebote der Parteien zum Kursdifferenzschaden übergehen durfte. Das Urteil ist



TRANSPERFECT

City of New York, State of New York, County of New York

I, Noosha Uddin, hereby certify that the document "Excerpt from Appeal Brief of
Porsche Automobile Holding SE to the Higher Regional Court of Stuttgart dated
February 25, 2019" is to the best of my knowledge and belief, a true and accurate
translation from German into English.

_____
Noosha Uddin

Sworn to before me this
May 14, 2019

_____
Signature, Notary Public

ANDERS MIKAEL EKHOLM
NOTARY PUBLIC-STATE OF NEW YORK
No. 01EK6378373
Qualified in New York County
My Commission Expires 07-23-2022

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE