# Exhibit 6

DANIEL J. HAYES (IL Bar No. 6243089)
Email: hayesdj@sec.gov
MICHAEL D. Foster (IL Bar No. 6257063)
Email: fostermi@sec.gov
JAKE A. SCHMIDT (IL Bar No. 6270569)
Email: schmidtj@sec.gov
KEVIN A. WISNIEWSKI (IL Bar No. 6294107)
Email: wisniewskik@sec.gov

175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-3368
Facsimile: (312) 353-7398

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN AKTIENGESELLSCHAFT, MARTIN WINTERKORN, VOLKSWAGEN GROUP OF AMERICA FINANCE, LLC, and VW CREDIT, INC.,<br><br>Defendants. | Case No. 3:19-cv-1391-CRB<br><br>**DECLARATION OF JEFFREY A. SHANK CONCERNING SEC'S VOLKSWAGEN INVESTIGATION** |

Pursuant to the Court's May 10, 2019 Order, Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission") submits this declaration to address the Court's questions concerning the timing of the filing of the Complaint on March 14, 2019.

## I.    Introduction

1.    This declaration provides a timeline of the SEC's investigation into Volkswagen AG ("VW AG") and its affiliates (collectively "VW"[1]), entitled "In the Matter of Volkswagen Auto ABS Offerings," which was conducted by the SEC Division of Enforcement's Complex Financial Instruments Unit ("CFI") staff based out of Chicago (the "Staff").  The purpose of this declaration is to provide the Court with information so that it can understand the timing of the investigation, as well as why the SEC filed its Complaint when it did, on March 14, 2019.  It is not intended to be a complete accounting of every action and step taken during the investigation.

2.    As no one on the investigative team has personal knowledge or memory of every event in the investigation, I have attempted to summarize the collective memories of the Staff as well as the investigative record.  This declaration is based on my personal recollection; discussions with other Staff assigned to the case; and a review of the investigative record by me and other Staff, including documents produced to the SEC, correspondence and email, witness statements, court filings, and other publicly available information.

3.    By submitting this declaration, the SEC is responding to the Court's May 10, 2019 Order without prejudice, forfeiture or waiver of the attorney-client privilege, the work product protection, the deliberative process privilege, the investigatory privilege, or other privileges or protections recognized under federal law ("Protected Information") that the SEC would otherwise be entitled to assert with respect to the Protected Information and its subject matter.

4.    On September 21, 2015, the SEC's New York Regional Office opened an inquiry entitled "In the Matter of Volkswagen AG Emissions" into whether VW violated the federal securities laws by failing to disclose its defeat device scheme to investors, with a primary focus on VW American Depository Receipts ("ADRs") traded in the United States (the "New York investigation").  That same day, CFI, which specializes in investigations concerning complex

---

[1] This investigation involved multiple VW entities as well as Porsche entities.  Throughout the declaration, for simplicity I refer to these entities generically as "VW" except when identifying the specific entity is required for clarity.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:10-cv-01391-CRB

and structured products, opened an inquiry staffed out of the Chicago Regional Office entitled "In the Matter of Volkswagen Auto ABS Offerings" (the "CFI investigation") that initially focused on the impact of the VW scandal on the asset-backed securities ("ABS") sponsored by VW Credit, Inc. ("VCI"), a wholly-owned subsidiary of Volkswagen Group of America, Inc. ("VWGoA"), which itself is a wholly-owned subsidiary of VW AG.[2]

5.      Between October 2015 and March 2019, the Staff issued at least forty document/information requests and subpoenas, obtained approximately two million pages of documents from at least eighteen producing parties, and obtained information from at least twenty witnesses.  Many of the documents and witnesses relevant to the investigation were located in or resided in Germany.

6.      From October 2015 to March 2017, the CFI investigation focused exclusively on VCI's ABS offerings in the United States.  In March/April 2017, the Staff expanded the investigation to include private bond offerings issued to U.S. investors pursuant to Rule 144A of the Securities Act of 1933 ("VW Bonds") by Volkswagen Group of America Finance, LLC ("VWGoAF"), a wholly-owned subsidiary of VWGoA.

7.      While VW acknowledged its use of a defeat device back in 2015, which served as the basis for environmental and consumer lawsuits and criminal cases brought by the Department of Justice ("DOJ") and other federal and state agencies, and later admitted certain facts connected to the use of the defeat devices in its January 2017 plea agreement, VW has denied that it acted knowingly, recklessly, or even negligently, in failing to disclose the emissions issues to investors.  In order to making charging recommendations to the Commission, the Staff needed to gather evidence to determine whether:

a)      As contended by VW at multiple points in the investigation, this was a case of a handful of engineers in Germany defrauding not just consumers but also VW's unknowing senior management, resulting in the company inadvertently failing to

---

[2] Because the Complaint arose from the CFI investigation, and the New York investigation did not affect the timing of the filing, this declaration focuses on the activity in the CFI investigation, except where noted.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

disclose its emissions violations to U.S. investors while issuing billions of dollars of U.S. debt at lower interest rates; or

b) VW, through its employees—many of whom were located in Germany—acted knowingly or recklessly, or at least negligently, when it issued billions of dollars of debt to U.S. investors without disclosing its widespread emissions violations.

8. To complete the investigation, the Staff gathered information that would show: (i) who was involved in the VW securities offerings, including the preparation, review, and approval of offering materials and due diligence responses associated with those offerings; (ii) the process for ensuring the offering materials were free from false statements or material omissions; and (iii) who was aware of VW's emissions issues, regulatory investigations, and/or VW's use of a defeat device.

9. The Staff performed a diligent investigation, but faced a number of challenges obtaining the evidence necessary to make charging recommendations to the Commission. There were the typical challenges faced in investigations of this nature involving large companies: (i) the numerous individuals involved in the company's processes for issuing securities required a complex scienter analysis for VW and multiple individuals; (ii) approximately two million pages of documentary evidence that took producing parties months to gather and produce and took the Staff months to review; (iii) a robust "Wells" process whereby VW's and Winterkorn's counsel were afforded the opportunity to make their case that the SEC should not bring an enforcement action; and (iv) settlement negotiations that occurred over several months.

10. There were also a number of challenges unique to this case that made obtaining the necessary evidence to make informed charging recommendations to the Commission more difficult, including:

a) Many of the documents were located in Germany, and in some cases were written in German, slowing VW's review and production of documents. For example, according to VW counsel, VW employee email communications were subject to certain German and European privacy law protections requiring consent of individual employees or ex-employees before they could be reviewed and

produced.  VW sometimes took six or more months to produce requested documents, which VW at times attributed to these issues.

b)  VW admitted in its January 2017 plea agreement that approximately forty VW and Audi employees intentionally "destroyed documents and files related to U.S. emissions issues."  The Staff does not know the degree to which this affected its ability to obtain evidence of scienter.

c)  The Staff was unaware of the existence of the VW Bonds at the outset of the investigation and, in part because of CFI's focus on ABS issued by VCI, the Staff did not learn that the VW Bonds were guaranteed by, and ultimately controlled by, VW AG, until 2017.

d)  Once the Staff began investigating the VW Bonds, it took ten months for VW to disclose who was responsible for the preparation, review, and approval of the statements made to VW Bond investors, which was important to assessing scienter.  On April 18, 2017, the Staff requested that VW identify the employees with the most knowledge of or involvement in the VW Bond offerings.  Despite consistent follow-up by the Staff, including more detailed follow-up requests in August 2017 for information and documents about the operations of bond offerings and who was responsible for the preparation, review, and approval of the offering materials, VW did not identify individuals with knowledge of these issues until October 30, 2017.  VW also did not produce or disclose the existence of spreadsheets it maintained that set forth the individuals and departments responsible for reviewing sections of the offering memoranda or its written answers to due diligence questions.  The Staff learned about these documents when a German witness first testified about the existence of these documents in early December 2017, and VW did not produce them until February 2018.  After receiving the spreadsheets identifying the individuals who reviewed the offering memoranda, the Staff then needed to check these names against the investigative

record to assess the knowledge and roles of the various reviewers listed on those spreadsheets.

e) The existence of the criminal investigations slowed the Staff's investigation. The Staff held off on pursuing information from certain key witnesses to avoid interfering with the ongoing criminal investigations and indictments. In addition, several witnesses at the center of the scheme declined to testify or be interviewed due to their criminal exposure, impeding the Staff's ability to gather evidence.

f) The Staff lacked the ability to compel the testimony of many of the critical witnesses because they were located in Germany and were no longer under VW's control. This required months-long negotiations with witnesses' counsel and/or German authorities, ultimately resulting in the Staff being denied the ability to speak to many of these witnesses, either by the witnesses themselves or by the German authorities due to pending criminal investigations in Germany. In one case, the Staff was delayed and limited in its ability to obtain evidence from a former VW employee because VW refused to continue to pay the witness's attorney fees.

11. The Staff did not file the Complaint until after it was able to develop the evidentiary record on the issue of scienter with respect to the issuance of ABS by VCI and the VW Bonds by VWGoAF, and after providing VW and Winterkorn with the opportunity to present their arguments in the Wells process.

12. The following paragraphs set forth many of the details of the investigation to further assist the Court in understanding the history of the Staff's investigation, including many of the challenges the Staff faced in fully developing the evidentiary record prior to making charging recommendations. This declaration demonstrates that since September 2015 the Staff diligently pursued the evidence necessary to determine whether there were securities law violations and endeavored to complete the investigation in a timely manner. The Staff did so while also managing responsibilities for a number of other investigations and matters in litigation.

## II.  The CFI Investigation Timeline

### A.  SEC's Initial Requests/Responses (Oct. 2015 to Apr. 2016)

13.  On September 21, 2015, the first business day after the publication of EPA's Notice of Violation to VW dated September 18, 2015, the Staff opened a matter under inquiry ("MUI") focusing on public ABS sponsored by VCI.  During the MUI phase, the Staff takes preliminary steps to determine whether an investigation is warranted and, if appropriate, converts the matter to an investigation.  In this case, the Staff converted the MUI into an investigation on October 14, 2015.

14.  On October 16, 2015, the Staff issued its first written document/information request to VW seeking to identify the full universe of ABS offerings that included "clean diesel" vehicles containing defeat devices ("Affected Vehicles") (or loans and leases thereon) in their collateral pool and to collect certain information about those offerings.  As part of the request, the Staff requested information concerning the potential impact on other VW brands, including Porsche.  The requests were narrowly tailored to determine the degree to which the ABS collateral pools were exposed to Affected Vehicles.

15.  On an October 30, 2015 call with VW counsel, the Staff stated that it would like to know who knew what and when about VW's use of a defeat device as determined by VW's internal investigation.  The Staff reiterated its request for this information at other points in the investigation.  *See* ¶¶ 23, 61, 65-66, 69.

16.  The Staff followed up by phone on November 20, 2015 and by email on December 7, 2015 concerning the status of production.  On December 8, 2015, VW counsel stated that they were "waiting for confirmation of certain facts from Germany."

17.  On December 9, 2015, VW made its initial partial response to the October 16 request and stated that it had "been delayed because certain of the Requests raise questions bearing on other ongoing governmental investigations and [VW's] internal investigation . . . ." VW counsel further stated that they were still "in the process of confirming whether and the extent to which these offerings have Affected Vehicles as collateral . . . ."  VW (including Porsche) provided additional responses to the October 16, 2015 requests on January 13, 21, and

7

25, 2016. These productions included information showing for the first time that the collateral pools for the ABS offerings included Affected Vehicles or loans and leases tied thereto, as well as the percentage of collateral in each ABS tied to Affected Vehicles.

18. On January 14, 2016, the SEC issued a formal order of investigation entitled "In the Matter of Volkswagen Auto ABS Offerings," which authorized the Staff to issue subpoenas for documents and testimony to investigate VW's potential violations of the federal securities laws.

19. On January 26, 2016, the Staff informed VW counsel that it intended to issue a subpoena for additional information. VW counsel requested that the subpoena be put in the form of a voluntary information request like the Staff's initial request and represented that VW would produce the requested information voluntarily. The Staff agreed to permit VW to respond on a voluntary basis.[3]

20. Between January 27 and February 5, 2016, the Staff issued follow-up requests for additional information based on VW's initial responses. Between February 17 and May 17, 2016, VW provided responses to those requests.

**B.** **Interview of VCI Witness and Follow-Up (Apr. 2016 to July 2016)**

21. On April 11, 2016, the Staff requested testimony from VW witnesses, to be scheduled in late April or early May 2016, and agreed to allow VW the opportunity to identify the appropriate witnesses after providing VW with a list of topics. On April 27, 2016, the Staff followed up with VW counsel, who stated that she was in London for a deposition, so there had been some delay in scheduling things. VW counsel proposed a late May interview date and later

---

[3] Following the May 10, 2019 initial status hearing in this case, media reports citing an unidentified "person briefed on the matter" claimed that the SEC served its first formal subpoena on VW in January 2017. However, the Staff had served written voluntary requests in this matter beginning in October 2015. Between October 2015 and January 2017, the Staff issued approximately eleven voluntary requests for documents and information to VW, based in part on VW's request that it be allowed to respond on a voluntary basis rather than pursuant to subpoena. On three occasions between January 2016 and January 2017, the Staff held off on serving subpoenas at VW's request pursuant to its agreement to produce documents voluntarily. *See* ¶¶ 19, 36, 42. The Staff served its first subpoena in March 2017 and served a combination of subpoenas and voluntary requests thereafter.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

identified a witness, whom the Staff interviewed on May 24, 2016.  The witness, who described himself as the "quarterback" of the ABS process, provided a significant amount of detail about VCI's ABS issuances, including information about the individuals involved and the issuance process.  The witness also identified additional "bilateral bank" ABS transactions that had not been previously identified in the investigation.  The VCI witness denied any knowledge of the defeat device scheme or any emissions compliance issues prior to public announcement of the defeat device scheme in September 2015.

22.     On May 25, 2016, attorneys for Porsche Financial Services, Inc. ("PFS") provided an attorney proffer at the SEC Chicago office concerning Porsche ABS, which included discussion of the amount of exposure to loans and leases tied to Affected Vehicles.

23.     On or around May 25, 2016, the Staff requested a presentation from Jones Day, who had been hired by VW to conduct an internal investigation into the defeat device issues, concerning the information it had obtained from its internal investigation, including an overview of "who knew what" about VW's emissions scheme to help expedite and focus the SEC investigation.  The Staff had previously requested, but had not received, information on this topic from VW on October 30, 2015.  VW agreed and set up a presentation for June 10, 2016.  On June 7, VW counsel informed the Staff that the presentation would be cancelled because DOJ had requested that Jones Day not give such presentations to other government agencies.

24.     On June 7, 2016, the Staff requested additional documents and information as follow-up to the May 24 and 25, 2016 meetings and witness interview at the SEC's offices, including information on the "bilateral bank agreements" first identified by the VCI witness on May 24.  The Staff also requested email communications of four VW custodians concerning five topics related to VW's emissions issues.  On July 15, the Staff provided VW with additional search terms and topics for these four custodians.  According to VW counsel, one of the four custodians was subject to German and European privacy laws that required the custodian's consent before his emails could be reviewed.  On August 23, VW informed the Staff that it had received the required consent.  Over the following months, the Staff followed up on multiple occasions concerning the status of production.  VW first produced emails from three of the

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

1   custodians on December 9, 2016, approximately six months after the Staff's initial request.

2   VW's initial production totaled approximately 15,000 pages, and the company produced

3   approximately 1,500 pages of emails from the fourth custodian (the one that required consent) on

4   January 20, 2017.

5          **C.**     **The Staff's Reverse Proffer and VCI's White Paper (Aug. 2016 to Nov. 2016)**

6        25.     On August 1, 2016, the Staff invited VW counsel to Chicago for a meeting to

7   discuss the Staff's legal theories and potential settlement. VW counsel said that they would

8   propose possible dates for that meeting. As of August 22, 2016, the Staff had not heard back

9   from VW counsel, so it requested available dates for the meeting. On August 23, 2016, VW

10  counsel stated that they were not available for a meeting until September 2016.

11       26.     On September 8, 2016, the Staff made a presentation to VW counsel, in which the

12  Staff summarized its investigative findings to date concerning violations in the ABS offerings,

13  addressed anticipated defenses, and discussed next steps, including potential settlement. The

14  Staff informed VW counsel that, based on the investigative record to date, the Staff believed VCI

15  had acted at least negligently in failing to disclose VW's emissions violations in thirteen ABS

16  offerings from 2011 to 2015. The Staff offered to explore early resolution of the matter on these

17  grounds, as an alternative to continued investigation.

18       27.     As part of this discussion, the Staff acknowledged that there would need to be

19  broader discussions involving other federal agencies regarding VW's overall financial exposure,

20  and offered to discuss a general settlement framework while deferring discussion of specific

21  dollar amounts until those broader discussions occurred. The Staff also discussed monetary

22  relief in general terms and provided a preliminary estimate of VCI's gains on the thirteen ABS

23  offerings from 2011 to 2015.[4] The Staff requested that VW counsel respond in seven to ten days

24  concerning whether VW was interested in exploring settlement.

25

26

---

27  [4] When the SEC filed its Complaint in March 2019, the SEC alleged violations in connection
    with four ABS offerings issued between April 2014 and September 2015. The Staff's estimate

28  of VCI's gains was revised downward when they no longer considered ABS issued from 2011 to
    2013.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

28.     At the September 8 meeting, VW counsel argued that VCI had acted consistent with industry practice, disputing that VCI had acted even negligently.  VW counsel stated that they wanted to submit a white paper in response to the Staff's position, and the Staff agreed to give VW time to submit one.  I do not recall if the Staff set a deadline for the white paper, but my review of the investigative record showed that the Staff expected to receive the white paper the week of September 19, 2016.

29.     On September 27, 2016, the Staff had a follow-up call with VW counsel concerning the white paper and settlement.  VW counsel reiterated that they believed it would be helpful if they submitted a white paper, and stated that they had a draft already and that they expected to submit the white paper in seven to ten days.

30.     On October 7, 2016, a representative from DOJ's Environment and Natural Resources Division ("ENRD") emailed VW counsel and requested VW's consent to permit DOJ to share certain VW financial information with the SEC that was necessary to facilitate global settlement discussions among the federal agencies and to allow all agencies to be in the same room with VW for settlement discussions.  On October 7, 2016, VW counsel responded that they wanted to discuss the issue further, and that they had "a different view of the SEC's claims than those of DOJ ENRD and DOJ Criminal."  On October 14, 2016, ENRD informed the Staff that VW refused to consent to the sharing of financial information with the SEC.  As a result, global settlement negotiations between VW and the federal agencies proceeded without the participation of the SEC.

31.     On October 14, 2016, VCI submitted a 42-page white paper setting forth its arguments against an SEC case based on the ABS issuances.

32.     The Staff evaluated VCI's white paper in the following weeks.  On November 14, 2016, the Staff notified VW counsel that it disagreed with VCI's white paper arguments.  The Staff also informed VW counsel that it intended to continue with the investigation.

33.     Around this time, there were new press reports of investigations and accusations concerning senior level VW officials.  Other press reports at this time concerned defeat devices at Audi.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

**D.    Continued Investigation Into ABS Offerings (Nov. 2016 to Feb. 2017)**

34.    On November 16, 2016, the Staff sent VW counsel an email inquiring about documents that still had not been produced in response to the June 7, 2016 request and seeking additional information.  The email stated that VW counsel had previously informed the Staff that part of the delay in producing these communications was attributable to European/German privacy issues, which required permission from one of the custodians before his communications could be reviewed.  However, the Staff noted that since VW's counsel had informed the Staff on August 23, 2016 that they had obtained the required consent, the Staff requested that VW produce the documents.  VW ultimately produced the emails responsive to the June 7, 2016 request on December 9, 2016 and January 20, 2017.

35.    In the November 16 email, the Staff also requested that VW provide additional information and documents related to the recent press reports, as well as additional communications and documents concerning, among other things, the ABS offerings and the study sponsored by the International Council on Clean Transportation ("ICCT Study") that revealed elevated emissions levels in VW vehicles.  The Staff requested that the documents be produced by December 19, 2016.

36.    In early December 2016, the Staff asked VW counsel whether VW and Porsche would be voluntarily producing documents requested by the Staff's November 16 email.  The Staff followed up with an email and phone call on December 12, whereby the Staff advised that it would issue subpoenas on December 14 if VW did not confirm that it would produce voluntarily before then.  On December 14, VW counsel requested that the Staff hold off issuing subpoenas and confirmed that the U.S.-based VW entities would produce voluntarily (but needed more time to verify that other VW entities would produce).

37.    In early- and mid-December 2016, the Staff interviewed third-party witnesses at the finance subsidiaries of other automobile manufacturers concerning their ABS offering processes.  The information provided by other ABS issuers shed light on the industry practice for internal due diligence in connection with the preparation of ABS offering materials.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

38.     On or about December 7, 2016, the Staff requested that VW counsel provide support for their assertions in the white paper that VCI's practice for investigating the representations in the offering documents was consistent with industry practice.  The Staff also discussed this with VW counsel on December 15.  On multiple occasions, VW counsel stated that they would submit information supporting their arguments concerning industry practice for ABS issuers, but they never did.

39.     Throughout the remainder of December 2016 through February 2017, the Staff continued to receive productions from VCI, Porsche, and third-parties, sent additional document requests to VW, and interviewed additional third-party witnesses.

40.     On December 23, 2016, the Staff sent VW counsel a letter confirming a December 22 discussion concerning certain outstanding production issues, including that one custodian's communications requested on June 7, 2016 still had not been produced and that twelve of the requests from the Staff's November 16, 2016 letter remained outstanding.  Finally, the Staff requested that VW counsel identify who held various positions at VCI from 2009 to 2016, note whether they were still VW employees, and inform the Staff whether those individuals had travel plans or expected work absences planned for late January or February.

41.     On January 17, 2017, the Staff had a conference call with VW counsel during which the Staff communicated that the pace of production was unacceptable and that VW needed to ramp up production of documents requested in June 2016 and November 2016.  The Staff walked VW counsel through the outstanding issues with those requests.

42.     On January 23, 2017, Staff sent VW counsel two subpoenas, one to VW AG and one to VWGoA, and requested that VW counsel accept service and produce by January 30, 2017 all documents that VW translated from German to English and produced to DOJ.  On a January 25 call, VW counsel informed the Staff that VW did not want to be served with a subpoena because a subpoena would trigger production obligations to private plaintiffs.  The Staff agreed to forego the formal subpoena process on the condition that VW agreed to produce the

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

documents by February 3, 2017 at 3:00 p.m. CT.[5]  On February 2, 2017, VW produced the translated documents previously produced to DOJ, totaling approximately 298,000 pages.

43.     On January 25, 2017, the Staff sent VW counsel a letter stating that VW had not responded to several categories of information requested by the Staff in its December 23 letter and had failed to cure certain deficiencies concerning earlier requests noted in the December 23 letter.  The Staff requested that VW comply with the outstanding requests by February 3, 2017.  The letter also outlined eight deficiencies in the December 9, 2016 production (which was a partial response to the Staff's June 7, 2016 and November 16, 2016 requests), and requested additional information, including whether VW counsel represented certain witnesses.

44.     VW continued to produce documents pursuant to the November 16, 2016 and January 25, 2017 requests between January 27, 2017 and May 19, 2017, producing approximately 250,000 pages in response to these requests.

**E.     VW AG Plea Agreement and Statement of Facts (Jan. 2017 to Mar. 2017)**

45.     On January 11, 2017, VW AG executed a plea agreement in which it agreed to plead guilty to three criminal felony counts and pay a $2.8 billion criminal penalty.  VW agreed to plead guilty to participating in a conspiracy to defraud the United States and VW's U.S. customers and to violate the Clean Air Act by lying and misleading the EPA and U.S. customers about whether certain VW, Audi, and Porsche branded diesel engines complied with U.S. emissions standards, using a defeat device to circumvent U.S. emissions testing, and concealing material facts about its cheating from U.S. regulators.  VW also pleaded guilty to obstructing justice by destroying documents related to the scheme.  As part of the plea agreement, VW AG admitted and stipulated to eighty-two paragraphs of facts regarding its fraudulent scheme ("Statement of Facts").

46.     VW's Statement of Facts identified senior officials at VW AG that were aware of and involved in the defeat device scheme.  The admissions in the Statement of Facts cast new

---

[5] The Staff's decision to proceed by voluntary request rather than subpoena was not motivated by a desire to accommodate VW's concerns about its production obligations in other litigation. Rather, the Staff concluded that it would be able to obtain the requested documents more swiftly by securing VW's commitment to produce the documents within nine days.

light on VW's prior representations to the Staff that knowledge of the defeat device and emissions issues was limited to a handful of engineers in Germany.

47.     In February 2017, the Staff began to review the hundreds of thousands of pages of documents produced that month and requested information from third-parties.

48.     In March 2017, the Staff issued additional document requests and subpoenas seeking communications related to the ABS offerings and requested dates in April and May for testimony of four VW witnesses.

49.     In total, between October 2015 and June 2017, the Staff issued more than twenty information requests and subpoenas, received more than 900,000 pages of documents, and interviewed or took testimony from nine witnesses.

**F.    Continued Investigation and 144A Bond Offerings (Apr. 2017 to May 2017)**

50.     In March and April 2017, the Staff continued reviewing documents produced in February 2017 in response to the Staff's November 16, 2016 request. The documents revealed that the issuance of ABS constituted less than half of VCI's funding and that VCI relied on the issuance of other securities, including medium-term notes (which the Staff later learned were the VW Bonds), for a substantial portion of its funding. Moreover, the Staff learned that, unlike the ABS, certain of these other securities were guaranteed by VW AG and referenced VW AG's financial statements in their offerings. Based on the information available to the Staff as of March 2017, it appeared that multiple VW AG senior officials knew about the existence of the defeat device and/or the ICCT Study. The Staff therefore expanded the investigation to determine whether there were securities law violations, including scienter-based violations, in connection with the sale of these other securities that were guaranteed by VW AG, including the VW Bonds. The VW Bonds were sold to U.S. investors in private offerings, pursuant to an exemption from registration requirements of the federal securities laws.[6]

---

[6] On June 20, 2016, certain VW bondholders filed a putative class action securities complaint against VW and Winterkorn in the United States District Court for the Northern District of California (the "Bondholder Action"). On June 28, 2016, the Court ordered that the Bondholder Action was related to the MDL case titled *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-02672-CRB, MDL No. 2672 (Dkt. No. 1617). The first reference on the MDL docket to a "Securities Bond" Action appears to have been on December 16, 2016. (Dkt. No. 2507). While the Staff periodically checked the status of

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

51.     On March 16, 2017, the Staff sent VW counsel a letter that addressed outstanding production issues and included additional document requests and requests for testimony of four VW witnesses. The Staff requested, among other things, all offering materials for commercial paper with maturities greater than nine months and medium-term notes issued by "VW" (which it defined as VWGoA and VCI) since 2013, with a production date of April 13, 2017. On April 13, 2017, VW responded that VWGoA had not issued any commercial paper or medium-term notes and that VCI was researching the issue.

52.     Around the time of VW's response, the Staff determined that VWGoAF, a different wholly-owned VWGoA subsidiary, was the issuer of medium-term notes, not VCI or VWGoA. On April 18, 2017, the Staff issued document/information requests asking that VW: (i) identify all securities issued or guaranteed by U.S.-based VW entities, or offered or sold in the U.S.; (ii) produce the offering materials for the securities; and (iii) identify board members for the offering entities. The Staff also requested that VW "[i]dentify the VW employees/corporate representatives with the most knowledge of or involvement with" these securities.

53.     Between May 26 and June 1, 2017, VW produced the offering memoranda for the various securities offerings in response to the Staff's request for offering materials for those securities. At the time, however, VW did not produce certain other offering materials, such as the subscription agreements that are referenced in the Complaint. The Staff obtained the subscription agreements from third-parties later in 2017. To the Staff's knowledge, VW did not produce the subscription agreements until early 2018.

---

the MDL docket, no member of the CFI investigation team believes it was aware of the Bondholder Action, including the press reports about its filing, before April 2017. In October 2015, the New York investigation team identified bond issuances by VW, but note that appeared to be issued in the U.S. In the spring and summer of 2016, the New York investigation team conducted additional searches for U.S.-based securities offerings by VW. It appears that the New York investigation team became aware of securities issued by multiple VW subsidiaries, including VWGoAF (but none by VW AG) during this period. In August 2016, New York team shared with the CFI investigation team a list of seventy-six VW securities that another government agency had compiled, which included securities issued by VWGoAF. However, the CFI investigation was focused exclusively on ABS issuances at that point and was preparing for a reverse proffer presentation to VW on the ABS in anticipation of possible settlement discussions.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

### G. June 2017 Testimonies and Follow-Up (June 2017 to Aug. 2017)

54. The Staff had several discussions with VW counsel in early May 2017 concerning production and witnesses. Around that time, VW counsel advised the Staff that they met with VW employees in Herndon, Virginia to discuss the Staff's April 18 requests. On May 9, 2017, VW counsel told the Staff that they were waiting on names of the point people for certain VW securities, including the VW Bonds, and expected to provide that information to the Staff within a week.

55. On May 12, 2017, the Staff requested testimony from two more VW employees in addition to the four witnesses the Staff had requested testimony from on March 16, 2017.

56. While scheduling the testimonies that would cover, among other things, how the VW Bond offering process worked, VW counsel proposed substituting two of the witnesses identified by the Staff with two other witnesses that VW counsel represented had "more relevant information." One of the two witnesses VW counsel proposed as a substitute was a Senior Manager in VWGoA's Treasury Department. VW counsel described the proposed witness as the "nuts and bolts" guy who could testify as to how the VW Bonds were issued.

57. During a May 15, 2017 telephone call with the Staff, VW counsel stated that the witnesses would not be available until late June 2017.

58. From June 26 to June 29, 2017, the Staff took investigative testimony from five U.S.-based witnesses concerning the ABS and VW Bonds, including the Treasury Senior Manager suggested by VW counsel. The Treasury Senior Manager identified by VW counsel was unable to answer many of the Staff's questions concerning the VW Bond offering process and testified that the process was primarily managed out of Germany. The witness did not know, among other things: (i) who was involved in providing the information that went into the VW Bond offering documents; (ii) who approved the VW Bond offering memorandum before it was issued; (iii) whether the process involved checklists or documents used to obtain approvals from the various departments that worked on the offering memorandum; (iv) what processes or procedures existed for the drafting or the sources of information flowing into the offering

memorandum; or (v) what departments or individuals were responsible for completing due diligence questionnaire responses.

59.     On July 6, 2017, the Staff issued subpoenas for additional documents due July 20, 2017.  Included in these subpoenas was a request for production of copies of two binders that a June 2017 witness testified he maintained as well as certain information from a shared electronic drive that another June 2017 witness described.  The Staff also issued another subpoena to VW on August 9, 2017.

60.     During this period, the Staff also issued subpoenas to sixteen third-parties and took testimony of a former VCI employee.

### H.     The Staff's Continued Investigation (Aug. 2017 to Nov. 2017)

61.     Between August 2017 and October 2017, the Staff continued to follow up on the Staff's April 18, 2017 request that VW identify the VW employees most knowledgeable about the VW Bond offerings, renewed its request that VW provide information from its internal investigation concerning who knew about the diesel emissions issues, and continued to seek production of documents requested in its July 6, 2017 subpoena.

62.     On an August 10, 2017 telephone call with VW counsel, VW counsel stated that they had approved the production letter for production responsive to the Staff's July 6, 2017 subpoenas.  On this call, the Staff also addressed that it still needed information about the VW Bond offerings.

63.     On an August 23, 2017 telephone call with VW counsel, memorialized in an August 24 letter, the Staff discussed the overdue production from the July 6 subpoena with VW counsel and specifically addressed VW's failure to produce what appeared to be two readily accessible binders.  On the August 23 telephone call, VW counsel stated that they had responsive information for some of the requests but they were waiting for additional information on other requests.  The Staff requested that, given it was already late August, VW produce the documents it had already and supplement later with additional documents.  The Staff again raised with VW counsel the Staff's previous requests that VW identify the individuals involved in the VW Bond offerings, so that the Staff could understand the VW Bond offering process and the individuals

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

involved. The Staff agreed to work with VW counsel to identify the relevant individuals, policies, procedures, and other relevant documents. VW counsel agreed to provide the Staff with information regarding the individuals involved in the VW Bond offerings and how those offerings were prepared, approved, and issued. In order to avoid any confusion, in its August 24 letter, the Staff explained in detail the information it sought about the VW Bonds and requested that VW produce documents related to that information:

- For each VWGoAF Note Offerings:

    o Planning: Which people/departments were involved in the planning process? What was that process? Which people/departments decided that a note offering should be made, and the amount of the offering? How were those determinations made? Did a person/department/entity/board need to approve the plan to issue a note offering and/or the size of the offering? If so, who approved? Was that part of normal budget planning/financial needs forecasting for the quarter/year/some other time period? Were those budget plans/financial forecasts reviewed or approved by any person/department/ entity/board? If so, who reviewed and/or approved? Are there any relevant policies and procedures?

    o Drafting, Reviewing and Approving Documents: Which people/ departments/entities were involved in drafting the relevant documents? Who was involved in the initial draft? Who was involved in subsequent drafts? Were different people/departments responsible for different sections? Which people/departments reviewed the drafts? Which people/departments approved the final documents? Are there any other people/departments that had any involvement in the drafting, review and approval process? Are there any relevant policies and procedures? How were drafts circulated for comment and saved? Is there any documentation that tracks who approved the documents and the date that they were approved?

    o Even if they were not involved in the drafting/review/approval process, which people/departments were consulted regarding information relevant to the offerings documents and related documents?

    o Due Diligence: Were any questions received from any third party in relation to any of the VWGoAF Note Offerings? This would include, but not be limited to, questions from rating agencies, investors, financial institutions (in the role of structuring lead, underwriter, bookrunner, or any other role), or any other third party. What was the process for receiving and answering those questions? Were the questions submitted in writing? Were the questions answered in writing or orally? Which people/departments were involved in preparing and/or conveying responses to those questions? Are there any relevant policies and procedures?

    o Marketing and Selling the Notes: Which people/departments were involved in marketing and/or selling the notes? This includes people/departments who worked with third parties to sell the notes. Were there any presentations for prospective investors? This includes either actual or virtual "road show" presentations? If so, which people/departments were involved in preparing, reviewing and/or

approving the materials for those presentations? Which people/departments were involved in giving the presentations? Separate from those presentations, were there any marketing materials in connection with any of the VWGoAF Note Offerings? If so, which people/departments were involved in preparing, reviewing and/or approving those marketing materials? Are there any relevant policies and procedures?

• Which person/department/entity/board had review or approval authority with respect to any part of the process of planning, drafting, issuing, marketing and/or selling the notes/note offering? What documents or information did they rely on to make the decision to approve issuing, marketing and/or selling the notes?

• If there are documents relevant to any the bullet points above – *e.g.*, relevant policies and procedures – please produce those documents or, if they have already been produced, please identify by bates numbers.

64. In the August 24 letter, the Staff noted that, given the VW Bond offerings had been the subject of an MDL lawsuit for more than a year, it expected that much of the requested information had already been identified. The Staff again requested VW's cooperation to identify the universe of individuals who had knowledge of the diesel emissions issues, including the ICCT Study. The Staff concluded the letter by stating that "the sooner we receive this information and can take testimony of the relevant individuals, the sooner we can discuss the next steps in the staff's investigation."

65. The Staff and VW counsel had a follow-up call on August 31, 2017, at which point VW still had not produced any records responsive to the July 6 subpoena. The Staff discussed the overdue production with VW counsel, again referencing what the Staff believed to be certain readily accessible documents, such as two binders maintained by an individual and documents maintained in a shared electronic Treasury drive. VW counsel stated that they would produce certain records the following week and documents responsive to most of the other requests within two weeks. VW counsel also stated that VW would provide the names of the individuals involved in the bond offerings by the week of September 11, 2017. The Staff also discussed its recent request for information about who was aware of the diesel emissions issues

and the ICCT Study and noted that it expected that this information would be available from the internal investigation. VW counsel responded that another law firm had conducted the internal investigation, that they expected some DOJ sensitivity to sharing some of the information due to certain individuals involved, and that they needed to confirm that DOJ did not object to sharing that information. They stated that they would speak with the criminal team and get back to the Staff.

66. The Staff continued to follow up on the requested information throughout September and October 2017 and issued subpoenas for additional communications on September 11, 2017, including communications relating to due diligence responses. The Staff had previously requested information and documents concerning the due diligence process in its August 24, 2017 letter. The Staff sent multiple letters and emails during this period that detailed deficiencies in the document productions and urged VW counsel to identify the individuals with knowledge of the VW Bonds as requested six months earlier in April 2017 so that the Staff could schedule testimony. The Staff also followed up on its request for information about who knew of the emission issues and the ICCT Study, as VW had not gotten back to the Staff regarding its intention to confirm with DOJ that there was no issue sharing that information.

67. VW first produced records responsive to the July 6 subpoena on September 15, 2017 and made its last production on November 8, 2017. VW produced approximately 534,000 pages in response to the Staff's July and August 2017 requests.

68. On October 6, 2017, in the absence of information from VW, the Staff identified four German witnesses that it intended to take testimony from, and another ten individuals for which the Staff sought additional clarification of their roles to assess whether their testimony was required. The Staff requested that the witnesses appear in London for testimony the week of December 4, 2017.

69. On October 9, 2017, VW counsel responded to the Staff's request for information concerning who knew about VW's emissions issues and the ICCT Study by providing the Staff with a list of twenty-three previously-produced documents and forty-seven pages of additional documents.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

70.     On October 30, 2017, VW counsel identified for the first time four individuals with knowledge of the bond offering process (two who were on the Staff's October 6 list of four witnesses and two who were not on the Staff's list) and offered to make them available for testimony the week of December 4 in London.  The Staff scheduled a total of five witness testimonies for that week.

71.     On November 7, 2017, the Staff issued a subpoena for documents to be produced ahead of the December testimonies, including board minutes.  VW first began producing documents pursuant to this subpoena on January 30, 2018, after the scheduled testimonies.  VW made its first production to the September 11, 2017 subpoenas on December 19, 2017 (after the London testimonies), and continued to make productions pursuant to the September 11 subpoenas through June 8, 2018.  The Staff also issued a subpoena on November 30, 2017, to which VW made productions between April and June 2018.

72.     In total, during 2017, the Staff issued more than thirty information requests and subpoenas, received more than 1.6 million pages of documents, and interviewed or took testimony from thirteen witnesses.

73.     Because certain key documents relating to the VW Bonds requested between August and November 2017 (including the spreadsheets and due diligence answer sheets described in ¶¶ 75-76) were produced after the testimonies, the Staff did not have the opportunity to use them in questioning the witnesses.

**I.      VW Bond Testimonies in London and Follow-Up (Dec. 2017 to May 2018)**

74.     From December 5 to December 8, 2017, the Staff took testimony in London from five European-based VW witnesses regarding the VW Bonds.

75.     During the London testimonies, the Staff learned for the first time answers to many of its questions about the VW Bond offering process, although the Staff still did not learn who specifically was responsible for reviewing or preparing the various portions of the offering memoranda and other relevant documents.  One witness testified that VW created and maintained a spreadsheet that identified the individuals and departments responsible for reviewing and updating specific sections of the VW Bond offering memorandum ("Bond

22

1  Spreadsheets").  These spreadsheets were responsive to the Staff's requests in its August 24,

2  2017 letter.  *See* ¶ 63.

3       76.    On December 15, 2017, the Staff issued a document request stemming from the

4  London testimonies, including a request for the Bond Spreadsheets for each of the VW Bond

5  offerings that identified the reviewers of the various sections of the offering memorandum.  The

6  Staff also requested the written answers to underwriter due diligence questionnaires for each

7  offering ("DDQ Responses"), which were identified by witnesses in the London testimonies and

8  were responsive to the Staff's requests in its August 24, 2017 letter (*see* ¶ 63) and its September

9  11, 2017 subpoenas ("All Communications concerning or related to VW's responses to the due

10  diligence questions").  The Staff also requested, among other things, certain board minutes and

11  resolutions for VW AG, VW's Supervisory Board, and VWGoAF.

12       77.    On January 12, 2018, the Staff emailed VW counsel to follow up on the status of

13  production for the November 7 and November 30 subpoenas and the December 15 requests.  VW

14  counsel responded with a status for each of the requests.  For the November 7 subpoena (which

15  included requests for org charts, articles of association, Board procedures, Board minutes, and

16  Board special reports), VW counsel stated that "We are working with Volkswagen AG to

17  determine what of these documents exist, and where they may be located.  These documents are,

18  as you can imagine, sensitive and take time to collect, especially with the long holiday season.

19  We anticipate some of these materials being included in our next production."

20       78.    VW did not produce any records pursuant to the December 15 requests until

21  February 2018.  VW produced, among other documents, the DDQ Responses on February 6, and

22  the Bond Spreadsheets on February 13.  From February 2018 to June 2018, VW continued to

23  produce documents responsive to the December 15 request, as well as to the September 11, 2017

24  and November 30, 2017 subpoenas.

25       79.    The Bond Spreadsheets produced on February 13 were important because they

26  identified for the first time the departments and individuals responsible for reviewing and

27  updating particular representations in the VW Bond offering memoranda and also shed light on

28  who was responsible for similar representations in the subscription agreements and due diligence

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

answers.  The DDQ Responses produced on February 6 were important because they memorialized the specific representations VW made to the underwriters' due diligence questions.  Following the receipt of the Bond Spreadsheets, the Staff reviewed the investigative record with this new information about who was involved in the VW Bond offering disclosures, including searching the electronic document database for additional documents relating to these individuals and attempting to determine which of those individuals were aware of the emissions issues and/or the ICCT Study.  The Staff then assessed the evidence and potential charges and discussed the investigative record with senior officials.

80.     From March to June 2018, the Staff continued to follow up on outstanding document requests, including the request for board minutes and its September 2017 and November 2017 subpoenas requesting emails.  Over the next several months through August 2018, the Staff engaged in back-and-forth with VW counsel concerning production of the board minutes requested in November 2017 and December 2017.  As for requested emails, VW counsel responded that production was slowed by the fact that many of the requested emails were written in German and later stated that they faced issues acquiring the required consent to produce from certain individuals.

81.     On May 2, 2018, the Staff took testimony of a VW witness.  Following the testimony, at VW counsel's request, the Staff outlined for VW counsel its potential theories for liability.

**III.     The Staff's Pursuit of Foreign Evidence Throughout 2017 and 2018**

82.     Throughout the investigation, the Staff faced numerous obstacles in obtaining evidence from witnesses, which made it much more difficult for the Staff to determine who knew about the diesel emission issues.  The presence of criminal investigations in the United States and Germany impeded the Staff's access to witnesses, and the Staff at times held off on pursuing interviews or testimony from certain witnesses so as not to interfere with DOJ's criminal investigation.  The Staff had discussions with DOJ staff about this issue at various points during the investigation.  Certain key witnesses also declined to speak with the Staff due to the criminal investigations/indictments.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

83. In addition, unlike in most investigations, the Staff lacked the ability to compel testimony of many of the key witnesses who were based in Germany. Instead, the Staff was forced to resort to lengthy negotiations with witnesses' counsel and/or German authorities that ultimately proved unfruitful. Below are examples of the efforts the Staff made to speak with key witnesses, most of which were unsuccessful after many months.

### A. The Staff's Attempts to Interview Michael Horn (Feb. 2017 to Oct. 2017)

84. As part of the investigation, the Staff was interested in speaking with Michael Horn, the former CEO of VWGoA and former VCI board member, who was notified no later than May 2014 of the ICCT Study and the resulting potential liability from the emissions violations. However, Horn was in Germany, and the Staff could not compel him to testify. The Staff held off on attempting to interview Horn during 2016 so as not to interfere with the pending criminal investigations and indictments.

85. In February 2017, following the indictments and VW's entry of a guilty plea in January 2017, the Staff contacted counsel for Horn to explore whether Horn would submit to a voluntary interview. On March 7, 2017, Horn's counsel told the Staff that Horn would likely be willing to speak with the Staff and might even be willing to come to the United States if DOJ ensured safe passage.

86. Over the next several months, the Staff continued making efforts to secure safe passage for Horn and to arrange an interview.

87. On September 14, 2017, DOJ staff notified the Staff that they had informed Horn's counsel that DOJ would be willing to offer Horn safe passage to the United States for the sole purpose of giving testimony to the SEC, and that Horn's counsel had responded that he would speak to Horn and then reach out to the Staff. The Staff repeatedly followed up with Horn's counsel. On October 29, 2017, Horn's counsel wrote in an email to the Staff, "At this time, Mr. Horn will decline a voluntary interview with the SEC and we are not authorized to accept service of a subpoena on his behalf."

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

### B. Requests for Assistance from Foreign Authorities

88. In December 2017, after returning to the United States following the London testimonies, the Staff drafted a Request for Assistance to Bundesanstalt für Finanzdienstleistungsaufsicht ("BaFin"), the German securities regulator, to facilitate speaking to several German witnesses. The Staff worked with the SEC's Office of International Affairs ("OIA") on the Request for Assistance.

89. On January 18, 2018, a representative of a U.S. affiliate of an international bank confirmed to the Staff that its German affiliate had an audio recording of a VW Bond due diligence call. The representative stated that the Staff should go through BaFin for the German bank to produce the recording.

90. On January 31, 2018, OIA sent a Request for Assistance to BaFin to: (1) obtain the audio recording from the German bank; and (2) facilitate the SEC speaking with and obtaining documents from six former VW employees and board members located in Germany, including Winterkorn, Horn, and three other individuals referenced in the SEC's Complaint.

91. OIA had communications with BaFin over the next several months.

92. On June 8, 2018, BaFin provided the requested audio recording to the SEC.

93. On July 6, 2018, BaFin notified the Staff that it would not be able to assist the Staff in interviewing or facilitating interviews of the requested individuals because of ongoing criminal proceedings in Germany. BaFin recommended that the Staff file a formal request for legal assistance with the German prosecutor, known as a Mutual Legal Assistance Treaty ("MLAT") request, which requires DOJ assistance and approval. From approximately August 2018 through December 2018, the SEC worked with DOJ to submit an MLAT request, but DOJ ultimately declined to submit the request on the SEC's behalf.

94. On August 1, 2018, the Staff attempted to obtain an audio recording from a U.S.-based investment bank regarding the VW Bonds. The Staff was informed that the bank's United Kingdom-based affiliate possessed the requested recording, which meant the Staff needed to go through the United Kingdom's regulator to obtain the information. On August 10, 2018, OIA sent a Request for Assistance to the Financial Conduct Authority ("FCA"), the United

Kingdom's financial regulator, to obtain the information.  On November 28, 2018, the FCA produced the requested recording.

### C.    The Staff's Attempt to Interview Winterkorn

95.    In August 2018, as part of the Wells process, VW counsel informed the Staff that they had spoken with Winterkorn's counsel and that Winterkorn would be willing to be interviewed by the Staff, despite being in Germany and under indictment in the United States.

96.    On September 11, 2018, the Staff contacted Winterkorn's counsel to schedule an interview with Winterkorn.  On September 18, the Staff emailed Winterkorn's counsel and proposed the format of the interview, where Winterkorn would remain in Germany and the Staff would establish a video conference and arrange for a stenographer and a German interpreter. VW counsel responded that they asked co-counsel in Germany to look into the legality of the requested interview.  Counsel requested that the Staff provide "authorities" indicating that the video conference interview was lawful.

97.    On September 19, the Staff responded that it had consulted with the SEC's international experts, and that the experts were unaware of any legal impediment to an individual in Germany voluntarily submitting to an interview.  On September 25, the Staff followed up with Winterkorn's counsel about the interview.  Winterkorn's counsel replied that since the Staff had not offered any authorities concerning the legality of the interview, they were continuing to explore the issue with an expert on German law.  The Staff reiterated that it was unaware of any legal impediment and further noted that it intended to notify the appropriate German authorities once the interview was scheduled and expected that they would notify the Staff if they had any objections.

98.    On October 1, 2018, Winterkorn's counsel informed the Staff that, based on counsel's review, it was not clear to him that any interview of Winterkorn would be permissible under German law.  As a result, the proposed interview with Winterkorn did not occur.

## IV.    The Wells Process (June 2018 to Nov. 2018)

99.    In June 2018, the Staff made a preliminary determination to recommend that the Commission authorize an enforcement action against VW AG, VWGoAF, and VCI.  Consistent

27

with SEC policy, on June 28, 2018, the Staff issued so-called Wells notices to VW AG,

VWGoAF, and VCI, explaining its intention to recommend that the Commission authorize

enforcement action against those entities. The Staff also suggested on a call with VW counsel

that settlement discussions occur concurrently with the Wells process. The Staff provided VW

until July 19, 2018 to make a Wells submission. As part of the Wells process, the Staff made

testimony transcripts and exhibits available for VW's review.

100.    VW counsel requested to meet in Chicago to go over the Staff's liability theories

in more detail. On July 2, 2018, the Staff met with VW counsel in Chicago and presented a

PowerPoint that walked through the Staff's legal theories and evidentiary basis for those

theories. On July 3, 2018, in response to VW counsel's request for an extension for the Wells

submissions, the Staff extended the deadline to July 26, 2018 and proposed a date window of

July 30 to August 3 for a "Wells meeting" with the SEC's Co-Director of Enforcement ("Co-

Director") at which VW counsel could present their arguments directly to the Co-Director.

101.    On July 5, 2018, VW counsel requested an extension until September 7 for the

Wells submissions and requested that the meeting with the Co-Director be held later in

September. VW counsel stated that since the Staff was still seeking production on outstanding

requests (from seven to eight months earlier), the Staff must not believe the investigative record

was complete and therefore the Wells process was premature. VW counsel further argued that

they needed more time "to review thoroughly the extensive record," to analyze the Staff's

theories of liability, and to retain experts to review the Staff's theories of VW's savings on credit

yields as a result of its alleged misstatements and omissions. VW counsel further stated that the

likelihood of resolution would decrease if VW was forced to complete the process over a matter

of weeks in the middle of the summer.

102.    After several discussions on timing, the Staff ultimately agreed to extend the

Wells submission deadline until August 3 and set a deadline of August 17 for VW's proposed

submission of an expert report concerning damages. The Staff set two meetings with the Co-

Director, one on August 8 to discuss the Wells arguments concerning liability, and a second on

August 23 to discuss damages, including any expert analysis provided by VW, and settlement.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

103.     During this period, VW counsel requested to speak with the SEC's Division of Economic and Risk Analysis ("DERA") about its analysis of the market impact on the VW Bonds and ABS, wherein DERA estimated that VW was able to save more than $350 million in interest payments to investors by not disclosing the defeat device scheme.  The Staff made DERA staff available on August 2 to answer VW counsel's questions concerning its analysis.

104.     On July 30, 2018, the Staff emailed VW counsel reiterating its previous statements that it made sense to dual-track settlement discussions with the Wells submission and requested time that week to discuss settlement.  VW counsel responded that they did not think it made sense to have settlement discussions before the Staff had the Wells submissions.

105.     On August 4, 2018, VW AG and VWGoAF made an 87-page joint Wells submission, totaling 2,379 pages with exhibits, and VCI made a separate 36-page Wells submission, totaling 1,102 pages with exhibits.

106.     On August 8, 2018, VW counsel met with the Co-Director to present their arguments.  It was at that meeting that VW counsel stated that they had discussions with Winterkorn's counsel and that they believed that they could get him to speak to the Staff, despite the fact that he was in Germany and under indictment in the United States.  DOJ had indicted Winterkorn on March 14, 2018, which was unsealed on May 3, 2018.  (German prosecutors criminally charged Winterkorn on or around April 15, 2019.)  VW counsel reiterated the point in an August 10 letter in which they stated that "we would like to facilitate more fact finding by the Staff, including testimony from individuals to whom the Staff has not spoken.  We are prepared to use our best efforts to make present and former employees available for testimony, some of whom likely would be in Germany."[7]

---

[7] In its Wells submission, VW criticized the Staff for purportedly not even asking to interview six key witnesses, most or all of whom are former VW employees and two of whom have been indicted.  This was inaccurate.  In January 2018, the Staff requested BaFin's assistance to interview five of these witnesses, but its request was denied.  The Staff then attempted to secure assistance through an MLAT, but that too was unsuccessful.  The sixth witness was not included in the Staff's request to BaFin because VW withheld production of the Bond Spreadsheets until February 2018, delaying the Staff's discovery of the witness's importance to the bond offering disclosures until late in the investigation.  One of the six witnesses was Horn, whom the Staff spent months attempting to interview and even secured safe passage for him, before he refused to speak to the Staff.

107.     On August 10, 2018, the Staff communicated a settlement proposal to VW. [8]

108.     On August 18, 2018, VW submitted a 60-page "Supplemental Wells Submission on Disgorgement and Penalties" to the Staff, which totaled 187 pages with attachments, including a 38-page expert report.

109.     On August 23, 2018, VW counsel met again with the Co-Director to discuss their damages analysis and settlement.  At the meeting, VW counsel stated that they had confirmed that Winterkorn was willing to speak with the Staff.  The Staff requested that VW respond to its August 10 settlement proposal within a week.

110.     On August 29, 2018, the Staff followed up with VW counsel about receiving a counter-proposal.  Settlement discussions continued intermittently into early 2019, but no agreement was ever reached.

111.     On September 21, 2018, VWAG, VWGoAF, and VCI made a joint second supplemental Wells submission of 19 pages, plus a 49-page appendix.

112.     On October 2, 2018, after the unsuccessful attempts to arrange an interview with Winterkorn as described above, the Staff informed Winterkorn's counsel of its intention to recommend enforcement action against Winterkorn.  The Staff issued a Wells notice to Winterkorn's counsel that same day, setting a deadline for a Wells submission of October 19.  Winterkorn's counsel subsequently requested an extension of the Wells deadline to November 9.  The Staff agreed to extend the deadline to November 2.

113.     On November 2, 2018, Winterkorn's counsel provided the Staff with a 51-page Wells submission, totaling 333 pages with exhibits.

114.     On November 30, 2018, Winterkorn's counsel met with the Co-Director to present their arguments.

**V.     The Staff Continued Develop the Evidentiary Record During the Wells Process**

115.     Throughout the Wells process and the parties' settlement discussions, the Staff continued to gather information that further supported its recommended charges.

---

[8] Only the Commission can approve settlements.  Therefore, all settlement proposals negotiated with the Staff are in fact agreements to recommend a settlement to the Commission for approval.  The Staff does not have settlement authority.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

116. In September 2018, the Staff learned about former VW employees in Germany who may have had additional information relevant to VW's and Winterkorn's scienter. Between October 2018 and March 2019, the Staff requested and obtained information from these former employees who had knowledge of VW's defeat device, the emissions issues with VW's diesel vehicles, and the multiple inquiries from U.S. regulators.

117. On November 6, 2018, the Staff spoke with counsel for a former VW employee in Germany who had knowledge about VW's defeat device and who the Staff had reason to believe had interactions with Winterkorn on the subject. The Staff expressed interest in speaking with the former employee and confirming certain facts.

118. On November 27, 2018, the Staff emailed the witness's counsel to follow up and spoke with counsel on December 4, 2018. Counsel informed the Staff that the witness was willing to cooperate, but that the witness needed to get VW's permission before speaking with the Staff.

119. From December 27, 2018 through January 25, 2019, the investigative team was furloughed due to the federal government shutdown. On January 8, 2019, the CFI Chief, who was permitted to work during the shutdown, emailed VW counsel and wrote "we understand [witness's] counsel requested permission from VW to speak to us a month ago and has not yet received it. Given your offer to facilitate witness interviews, can you please look into this?"

120. On January 18, 2019, the CFI Chief spoke with VW counsel and discussed settlement. They also discussed the German witness speaking with the Staff, and VW counsel stated that, while VW did not object to the witness speaking to us, the sticking point was that VW did not believe it needed to pay the witness's attorney fees, which VW counsel said went beyond VW's obligations under its plea agreement. VW counsel stated that since the Staff had already decided to bring enforcement action against VW, the company would not pay the fees.

121. On January 23, 2019, the witness's U.S. counsel stated that the witness's German counsel had told him that VW had originally said it would pay for any expenses, potentially even including the witness coming to the United States, but that they later heard VW changed its position and would not pay fees. The witness's counsel further explained that VW had been

paying attorney fees to date pursuant to an indemnification agreement and that in his view VW was obligated to pay.

122.    The Staff spoke with the witness's U.S. counsel shortly after the SEC reopened on January 28, 2019 following the conclusion of the government shutdown.

123.    On February 1, 2019, the Staff emailed the witness's counsel and stated that it was reaching out to VW to sort out the issues with the witness speaking with the Staff.  Over the next several weeks, the Staff communicated with the witness's counsel to confirm certain facts. On March 13, 2019, the witness's counsel sent the Staff an executed declaration by the witness. The declaration asserted that Winterkorn participated in discussions in November 2007 concerning VW's use of a dual-mode emissions system in its diesel vehicles.

124.    On March 14, 2019, the SEC filed its Complaint in this matter.

**VI.    Action Memo Process**

125.    Before filing the Complaint, the Staff requested and obtained the required authorization of the Commission to file the action.  As part of that process, the Staff prepared and circulated internally an action memorandum, which discussed in detail the recommended action.  The action memorandum goes through a robust review and comment process whereby numerous SEC divisions and offices review the recommendation and the proposed respondents' Wells submissions and submit comments to the Staff on the recommendation, including recommending changes to the action memorandum, as appropriate.

126.    From December 27, 2018 through January 25, 2019, the CFI investigative team was furloughed due to the federal government shutdown, interrupting the action memorandum review and comment process.

127.    Following the shutdown, the Staff completed the action memorandum process and submitted the recommendation to the Commission.  On February 28, 2019, the Commission approved the filing of the district court action against VW AG, VWGoAF, VCI, and Winterkorn. On March 14, 2019, the Staff filed the Complaint after confirming the additional facts with the German witness referenced above.

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

1 <u>**VERIFICATION**</u>

2      I, Jeffrey A. Shank, am an Assistant Regional Director in the Enforcement Division of

3 the United States Securities and Exchange Commission, Chicago Regional Office. I affirm

4 pursuant to 28 U.S.C. § 1746, that I have read the foregoing declaration and that, based on my

5 participation in the Commission's investigation in this matter, my review of the investigative

6 file, and my discussions with other members of the Staff, the above statements are true to the

7 best of my knowledge, information and belief.

8 Executed on July 8, 2019

9                                          /s/     Jeffrey A. Shank
                                                Jeffrey A. Shank
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB

1

## ATTESTATION (CIVIL LOCAL RULE 5-1(i)(3))

2    In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of

3 this document has been obtained from the signatory.

4 Dated: July 8, 2019

5

6                                    /s/    Daniel J. Hayes
                                            Daniel J. Hayes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Jeffrey A. Shank Concerning SEC's Volkswagen Investigation

Case No. 3:19-cv-01391-CRB